POLLARD *v.* STATE OF INDIANA.

[No. 28,619. Filed November 16, 1950. Rehearing denied December 20, 1950.]

*Frank A. Symmes, Charles W. Symmes,* both of Indianapolis; and *Waldo Ging,* of Greenfield, for appellant.

*J. Emmett McManamon,* Attorney General, and *Walter O. Lewis,* Deputy Attorney General, for appellee.

STARR, J.—The appellant was tried and convicted before a jury in the lower court on a charge of murder in the first degree and his punishment assessed at imprisonment during life.

Appellant argues that all the evidence as to the actual killing was confined to his written statements which were confirmed by his own testimony, and that due to the fact that each of these statements is to the effect that appellant shot the deceased in self-defense there was no evidence that a crime was committed.

The evidence introduced by the state tends to establish the following facts: On April 11, 1946, at about 8:30 A. M., a certain log house, then unoccupied, located about two miles East of Ladoga, Montgomery County, was seen burning. After the fire had subsided certain

witnesses for the state approached and found in the ruins and burning embers the skull and torso of a human being, minus hands and feet. On the same day, at about 9:45 A. M., a witness for the state testified that while working in a field about one mile North of Advance, Boone County, which is a village approximately ten miles Northeast of Ladoga, he observed an automobile stop at the bridge over Racoon Creek where it remained for three or four minutes. He saw the door of the automobile open and one or more persons get out; that immediately thereafter he saw a fire under the bridge; that this witness and another witness ran to the bridge and attempted to extinguish the fire by stamping it and pouring water on it. That he then saw an army blanket in the fire and pulled it out, from which tumbled a human foot and two human hands. That thereupon these witnesses called the sheriff of Boone County who arrived in about twenty minutes to whom they turned over the blanket and the hands and foot. That it was also observed there was a railroad fusee in the fire. Upon examination of the finger-prints of the severed hands it was found they were the hands of the deceased, Leland Miller.

State witness, John Wood, testified that at about 5:00 P. M., April 10, 1946, while he was in the company of the deceased at a certain street corner in Indianapolis, the defendant, accompanied by one Harry Adams, drove up in his automobile to where the witness and the deceased were; that the witness and the deceased entered the defendant's automobile and thereupon the four of them in said automobile went to a certain tavern in the city of Indianapolis; that while there the defendant stated to the witness, out of the hearing and presence of the deceased and Adams, that he should not be seen too much with him, the defendant, tonight, meaning the night of April 10th, as he

was going to kill the deceased. Thereupon the witness asked the defendant why he was going to kill the deceased and the defendant answered, "I am not going to do ten years for a guy like that." The witness then stated to the defendant, "You are silly. Miller is in poor health and can't live for more than a year." Whereupon the defendant remarked that he could not make a deal with Miller, but did not say what kind of a deal. This witness also stated that when he entered the defendant's automobile as above set out he noticed in the rear seat an army blanket and a fusee similar to the blanket and fusee which the other state witnesses testified they had removed from the fire.

The evidence further discloses that the defendant, after his arrest, signed two written confessions, each of which was received into evidence without objection. In the first of these confessions the defendant admitted that he had met the deceased and Wood at the time and in the manner as Wood had testified. He also stated that Wood left them at the tavern and that he, Adams and the deceased then went to the defendant's house; that while there the deceased made a "pass" at him with a knife and the defendant thereupon grabbed his gun and shot the decedent; that he got an army blanket, wrapped the deceased's body in it and decided to burn the body; that he procured five gallons of gasoline at a filling station and proceeded to drive to a point near Ladoga, Indiana, where there was a vacant house; that he removed the body from his car and chopped off the hands and one foot. He then took the body into the house, poured gasoline on it and set it afire; that he wrapped the hands and foot in the blanket, placed them in the trunk of his car, got into the car and started driving and drove until he came to a bridge where he threw the blanket with its contents under the bridge and set fire to the blanket; that

he set the fire with a railroad fusee. That after the fire was going he started home in his automobile and arrived there about 9:30 on the morning of April 11, 1946. That later in the day he drove to Kentucky. The confession states that he cut off the deceased's hands and foot because he knew the deceased had a criminal record and could be identified by his finger-prints; that the deceased had scars on the foot he removed by which he could also be identified. The con-fession also states that he threw the knife with which the deceased had attempted to cut him into White River near the New York Street bridge, Indianapolis.

In the second confession, which was offered in evi-dence substantially the same facts were related but in more detail as to the deceased attacking him with the knife.

The evidence also discloses that the defendant, on April 11, 1946, left the State of Indiana and went to Kentucky where he was arrested for this offense on April 21, 1946.

The state's evidence was also to the effect that search of the defendant's automobile after the alleged crime disclosed the shells of three railroad fusees on the ledge of the back seat.

The state's evidence further disclosed the deceased was small, weighed less than one hundred pounds, that he suffered from arthritis, that his body was crippled, his hands were twisted and in the shape of claws, that he had difficulty holding things in his hands and in getting food to his mouth, and that he had trouble walking and in getting up from his chair.

It is true that if that part of a statement of an accused which is in his favor is not disproved by other evidence, such favorable portion is deserving of as much consideration as the parts which make against the accused. See *Buffkin* v. *State* (1914),

182 Ind. 204, 106 N. E. 362; *Forrester* v. *Texas* (1923). 93 Texas Cr. 415, 248 S. W. 40, 26 A. L. R. 537. Here the evidence as to the killing is not confined to the written statements. As is indicated in the case last cited, the state, to prove the falsity of the exculpatory or mitigating part of a confession, is not compelled to introduce direct and affirmative evidence. It is enough that its falsity appears to the satisfaction of the jury beyond a reasonable doubt, from any or all the facts before the jury. It is our opinion that the state's evidence above delineated as to appellant's statement to the witness Wood, the manner in which he attempted to dispose of the body, his apparent flight from the jurisdiction, and the physical condition of the deceased at the time he was killed, were all items of evidence worthy of being considered by the jury and from which it was entitled to disbelieve the exculpatory portions of the statements.

The appellant, testifying in his own behalf, stated that he was at the home of his father from April 10, 1946, at 9:00 P. M. until after 10:30 A. M. on April 11, 1946, when he went to his own home and found that decedent's body was not there. Appellant's father, corroborating this testimony, testified on behalf of appellant that he found appellant asleep in a chair at his home when he returned from work at 5:00 A. M. April 11, 1946; that his son was drunk and he carried him to a bedroom in his house where he still remained when the witness left the house at about 12 o'clock noon of that day; that he did not know there was anything wrong when he left. After the proper foundation was laid by the cross-examination of this witness the state was allowed to prove by its own witness that the father had, on April 19, 1946, told this witness that when he came home from work at 5:00 or 5:30 o'clock on the morn-

ing of April 11, 1946, that his automobile was parked in front of his house, headed south, and that he had looked into the automobile and saw on the back seat a body wrapped in an army blanket. This testimony was objected to by the appellant on the ground that this was permitting the impeachment of the father's testimony on a collateral matter. This court has stated the law on this question in the case of *Young* v. *State* (1924), 194 Ind. 345, 347, 141 N. E. 629, as follows:

> "While it is true that a party is generally bound by the answer of a witness on cross-examination to a question relating solely to a collateral matter, yet it is also true that where a witness has been asked if at another time he made statements which, if true, are contradictory of or render improbable his testimony on a material matter and he answers in the negative, he may be contradicted, and this is so although the evidence which it is sought to impeach was brought on cross-examination."

See also *Gibbs* v. *State* (1917), 186 Ind. 197, 115 N. E. 584. This testimony comes within this rule. The purpose of the father's testimony in chief was to convince the jury that the appellant had not removed, mutilated and burned the body of the deceased. It was to corroborate the defendant's testimony on this phase of the case and to disprove a portion of the exculpatory parts of the defendant's written confessions. Whether or not the defendant did remove the body, mutilate it and attempt to burn it was a material matter.

In response to another question on his cross-examination the father denied that on October 31, 1947, he had caused one William Morris to come to his home and while there had requested the said Morris to sign a typewritten statement, which he did, to the effect that William Morris went to the father's home on the morning of April 11, 1946, to

clean wall paper and that the appellant was then present in the father's home asleep in a big leather chair, and that while Morris was present the father helped put the appellant to bed. Thereupon the court allowed the state to call the said William Morris as a witness for the state and to testify that on October 31, 1947, at the home of the said father in Indianapolis, at the request of the said father, he did sign a paper after reminding the father that he did not know anything about it. The appellant objected to the question which elicited this answer for the reason that it went to a collateral matter. It is our opinion that it was not error to permit this question to be answered. It is apparent that this was a preliminary question intended to lead up to an inquiry as to the contents of the paper itself and was by way of proper impeachment for the reasons heretofore given. This question was proper for the same reason the impeaching question relating to the father having seen the body was proper.

The appellant produced a certain witness, Lat Gatewood, who was permitted to testify as to a certain threat made by deceased against appellant, heard by this witness but never communicated to the appellant. At the time the appellant interrogated this witness as to this threat the state objected to the same on the ground that the threat had never been communicated to the appellant. Thereupon the record shows this evidence was permitted to go in and the witness testified in detail as to this threat. Immediately at the close of this witness's testimony the court on its own motion made the following statement: "All of the evidence of the witness except his name, address and occupation is stricken from the record. All of testimony of Lat Gatewood." The record as set out by the briefs herein does not disclose the court withdrew this

evidence from the consideration of the jury or that he admonished the jury not to consider the same, or that the court was requested so to do. Appellant contends that this action of the court was error due to the fact that the defense in this case was self-defense and that there was some evidence other than threats tending to support this plea. It is our opinion that proof of uncommunicated threats on the part of the deceased was admissible in this case. *Underhill's Criminal Evidence* (4th Ed.), § 564; *Wharton's Criminal Evidence* (9th Ed.), § 757; 2 *Warren on Homicide,* p. 537. See also *Leverich* v. *State* (1886), 105 Ind. 277, 4 N. E. 852; *Duncan* v. *State* (1908), 171 Ind. 444, 86 N. E. 641; *Holler* v. *State* (1871), 37 Ind. 57. Whether or not, however, the action of the court in striking "from the record" this testimony amounted to a withdrawal of the same from the consideration of the jury is a question which has caused us some concern. After careful consideration we have concluded that what was done here did not harm the appellant. From the facts as disclosed by the briefs herein we believe the jury, after having listened to this evidence could not, from what the court did, have understood that it was not to consider this evidence.

Finally the appellant urges that the court erred in refusing to give appellant's requested instruction No. 10. Without setting out this instruction, and without in any way approving of the same, we give as our opinion that in any case there could not have been error in refusing it for the reason that the same matter was fully and fairly covered by instruction No. 29 given by the court on its own motion.

For the reasons heretofore given the judgment herein is affirmed.

NOTE.—Reported in 94 N. E. 2d 912.