BANGE *v.* STATE OF INDIANA.

[No. 29,551. Filed January 9, 1958.]

424

*Grafton J. Kivett, Gilbert W. Butler,* both of Martinsville, and *Albert W. Ewbank,* of Indianapolis, for appellant.

*Edwin K. Steers,* Attorney General, and *Owen S. Boling,* Deputy Attorney General, for appellee.

PER CURIAM.—Appellant was charged by indictment with the crime of first degree murder under Acts 1941, ch. 148, §1, p. 447, being §10-3401, Burns' 1956 Replacement, tried by jury, found guilty of murder in the second degree, and sentenced accordingly.

Errors assigned here are the overruling of appellant's motion for a new trial, and the overruling of his motion for a directed verdict, both at the close of the State's evidence and at the close of all of the evidence.

*First:* Appellant asserts that the evidence is not sufficient to sustain the verdict of the jury because "the evidence shows conclusively and without any contradiction that the appellant shot his son-in-law, Gene Richardson, in self defense."

The rule governing the definition of self-defense in Indiana is concisely stated in *Myers* v. *State* (1922), 192 Ind. 592, 594, 595, 137 N. E. 547, 24 A. L. R. 1196, as follows:

"In this state, the law of self-defense, as deduced from modern authorities, is, 'that, when a person, being without fault, and in a place where he has a right to be, is violently assaulted, he may, without retreating, repel force by force, and if, in the reasonable exercise of his right of self-defense, his assailant is killed, he is justifi-

able.' " Ewbanks Ind. Criminal Law, Symmes Ed., Vol. 2, §1395, p. 764.

Whether or not appellant herein shot and killed the deceased in self-defense was an ultimate fact solely for the determination of the jury from the evidence in this case. *Landreth* v. *State* (1930), 201 Ind. 691, 697, 171 N. E. 192, 72 A. L. R. 891; *Ellis* v. *State* (1899), 152 Ind. 326, 330, 52 N. E. 82; *Buffkin* v. *State* (1914), 182 Ind. 204, 207, 106 N. E. 362; *King* v. *State* (1918), 187 Ind. 220, 221, 118 N. E. 809; *Myles* v. *State* (1955), 234 Ind. 129, 124 N. E. 2d 205, 207 (Cert. denied (1955) 349 U. S. 932).

The further rule applicable here is stated in *Myers* v. *State, supra* (1922), 192 Ind. 592, at page 594, 137 N. E. 547, 24 A. L. R. 1196, as follows:

". . . surroundings bearing upon the necessity or apparent necessity, as well as the amount of force necessary to employ to resist an attack, can only be determined from the standpoint of the appellant at the time and under all the existing circumstances, and were all proper matters for the jury alone to consider and weigh in determining whether or not she committed the homicide in the reasonable exercise of the right of self-defense, and its conclusion thereon the record before us will not allow us to disturb."

It was the burden of the State to overcome the defense of self-defense by proving the commission of the crime charged beyond a reasonable doubt. We cannot agree with appellant that the evidence on the question of self-defense is "conclusive" and "without any contradiction."

This assertion is grounded upon an alleged exculpatory statement given by appellant to the sheriff at the time of his arrest, and introduced in evidence by the State, pertinent parts of which are as follows:

"Q. What happened when you arrived at 789 S. Crawford?

"A. When I arrived at 789 S. Crawford they were in a ruckus. He was tearing up the furniture and tearing the rugs up off the floor. He said he was going to move them out of there tonight, meaning the furniture. I told him to leave the rugs down and I would pay him for what he had in them and finish paying Powell for what he owed him. Then he chased Geraldine out of the house barefooted and said he was going to kill her and that is the last I saw of Geraldine and I was still in the house.

"Q. How soon did you follow Gene and Geraldine out of the house?

"A. It was just a few seconds. He changed his course and went for his car, and I knew he had a gun in there some place and I could see by the color of his shirt that he turned around and came towards me and I thought he had a gun in his hand. He had something and I didn't know what it was. Then I stepped back towards my car.

"Q. Where was your car parked in regards to his car?

"A. I imagine about 15 feet from Gene's car and my car was headed East.

"Q. In what direction was Gene's car headed?

"A. He was parked with his car headed North in front of the house. When I reached in the car and got my gun, I picked up a couple of shells that were laying loose in the back seat. I then inserted one of them in the gun and beat him to the draw, firing two shots from my hip.

"Q. What type of gun did you have in your hands?

"A. Single barrel 16 ga. shotgun.

"Q. Whose gun is this?

"A. It is mine.

"Q. When you went to the car you reached in and got your shotgun and two shells?

"A. Yes.

"Q. In your own words what happened then?

"A. I inserted one of the shells in the gun, I fired the first shot from the hip and then reloaded and fired the second shot from the hip.

"Q. After you fired the first shot did you notice any blood on Gene?

"A. I couldn't see.

"Q. Did you at any time see any gun shot wound on Gene?

"A. Just before I started to leave.

"Q. Where was this gun shot wound?

"A. It looked like it was on the left hand side or right hand side I meant to say around the shoulder someplace."

Without deciding whether the foregoing is an exculpatory statement, it is sufficient to say that even if it was, the State is not compelled to introduce direct and affirmative evidence to rebut it.

If "its falsity appears to the satisfaction of the jury beyond a reasonable doubt, from any or all the facts" in evidence, it is sufficient. *Pollard* v. *State* (1950), 229 Ind. 62, 68, 94 N. E. 2d 912. The jury was not compelled to believe appellant's statement even though it was introduced by the State as proof of the commission of the crime charged.

In examining the evidence in the record most favorable to the State, to determine whether there is sufficient evidence to support the verdict of the jury, we find that appellant testified as a witness in his own behalf, in part, that on the evening before the fatal shooting he had interceded in a quarrel between the deceased and his wife (appellant's daughter) and deceased said that he would "shoot" appellant if he came back to 789 Crawford Street where deceased lived;

that at the request of his daughter appellant **returned** to the home of the deceased about 7:35 P.M. on September 28 and when he arrived there was a "ruckus going on"; that deceased told appellant that he had no business there and after further quarreling appellant's daughter ran out the door with deceased in pursuit; appellant followed them out a few seconds later to see if he could find Geraldine (his daughter); and that when deceased saw appellant coming out of the house "he [the deceased] changed his course and went to the car" and opened the car door and reached inside. Appellant then testified that "I imagined it was his gun, he had a gun in there." Appellant further testified that he had a single barrel 16 gauge shotgun in his car and when he saw deceased reach into his car, he reached into the back of his own for his shotgun. At this point appellant testified as follows:

"Q. Tell what you did next?

"A. Well, I got the gun out and I fumbled around and got a couple of shells out and I inserted one and he was coming at me and I fired along at my hip some place.

"Q. Where were you standing at that time?

"A. I was standing a little back of the tree on the South side of the house.

"Q. Standing between the house and the tree perhaps?

"A. On the West side of the tree a little bit.

"Q. Which direction had you started from the house after you got the gun?

"A. Well, I was turning around from the door where I got the gun and I seen him coming, I was facing where he was, he was coming facing me and stooped over in a stooped position.

"Q. Did you fire at him at that time?

"A. I did.

"Q. Describe the movements of the gun, what you did, tell what you did?

"A. Well, I fired that time and then I re-loaded as far as I can remember—

"Q. Where did you have the shells?

"A. In my hand.

"Q. Did you hold the shell in your hand at the same time you shot?

"A. Yes.

"Q. Do you know whether you struck Mr. Richardson the first time or not?

"A. No, I don't believe I did.

. . . .

"Q. Do you recall whether he was within the space of this light at the time you shot?

"A. No, he was not, he was North of that light.

"Q. Did you have an opportunity to leave the premises at that time?

"A. Well, I did, I went and looked—I looked to see."

Appellant, at the time he got his shotgun out of his car, testified as follows:

"Q. At this time what was the state of your mind, do you recall anything of the past?

"A. Well, a lot of things crossed my mind, the things he had done to me and the way I had been treated and the way they had cost me a lot of money and stuff like that and what it cost me and not to have any peace of mind."

In answer to questions by the sheriff, as shown by appellant's statement admitted into evidence, without objection, as State's Exhibit No. 9, appellant stated that when he went to the car he reached in and got his shotgun and two shells; that he inserted one of the shells in the gun and "fired the first shot from the hip and then reloaded and fired the second shot from the hip."

A neighbor who lived 183 feet from the scene of the shooting testified, as a witness for the State, that on the evening of September 28, 1956, between 7:30 and eight o'clock P.M. she was sitting in her living room listening to the television when she heard a "commotion down at the Richardson home" and she went out her back door to "see what was happening"; that she heard no noise when she first went outside, then she heard a shot coming from the direction of the Richardson house; and that after the shot she heard Gene say, " 'Oh, don't do that, Ike, you have already shot my arm off,' and I heard the second shot." This witness further testified as follows:

"Q. Then what happened?

"A. Then Ike had asked him 'Gene, are you dead, is it fun to be dead, you Son of Bitch.'

"Q. Then what did you hear?

"A. Then he called his daughter Jerry, Oh, Jerry where are you and I didn't hear her answer.

"Q. Did you see the defendant, Isaac Bange, at any time there?

"A. Well, I saw him go to close the door of their house."

This witness further testified that she "saw Gene fall from the light of the door."

On cross-examination she further testified as follows:

"Q. When you first went out the back door, did you hear anything?

"A. No.

"Q. There was a spell of quietness?

"A. Yes.

"Q. And what was the first thing thereafter that attracted your attention?

"A. Well, I was standing there and I heard Gene say—I heard the first blast of the gun—and then I heard Gene say 'Oh, don't do that, Ike, you have already shot my arm off,' and then I heard the second blast.

. . . .

"Q. Did you hear Ike say anything more?

"A. Yes, I heard him say 'Gene, are you dead— is it fun to be dead, you Son of Bitch.'

"Q. And then you heard him call Jerry?

"A. And he said you will never tear up anything else for me.

"Q. Then he called for Jerry?

"A. Yes.

"Q. Is that all the words you heard?

"A. I heard him say I had better go up and give myself up to the sheriff."

A deputy sheriff testified that when he went to appellant's home to make the arrest he heard appellant say to his daughter over the telephone, "Gene would not tear up anything else for me," or something to that effect.

A police officer who accompanied the deputy sheriff above mentioned also heard the telephone conversation between appellant and his daughter, and he testified that he heard appellant say, "Jerry, he won't bother you any more."

There is other evidence in the record corroborating, in a measure, the evidence above summarized and set out and from which reasonable inferences might have been drawn by the jury to support the verdict.

The jury was not compelled to believe appellant's written statement and oral testimony that he shot the deceased in self-defense. The evidence, as summarized and set out above is sufficient, if believed by the jury,

to overcome appellant's plea of self-defense and to sustain the verdict of the jury.

If we agree with appellant that he was a peacemaker in a dispute between his daughter and son-in-law, that the deceased was the aggressor, and that because of the action of deceased in changing his course and going to his car he was justified in shooting him, there might have been some doubt about the reason for the first shot, but the jury certainly was justified in finding beyond a reasonable doubt that when appellant re-loaded his single barrel shotgun and fired a second shot into deceased as he was, according to the testimony of the only eye witness to the shooting, begging for mercy, this shot was not fired in self-defense.

In our opinion there was sufficient evidence of probative value from which the jury could have found that appellant was guilty of the crime of which he was convicted.

*Second:* Since the evidence was sufficient to sustain the verdict it was not error to overrule appellant's motions for a directed verdict.

*Third:* Appellant asserts error in refusing to give his tendered Instructions Numbered 2, 4, 7, 8, 9, 11, 14, 15, 16, 17 and 19.

We deem it unnecessary to burden this opinion by setting out these instructions in full. However, we have examined them in connection with other instructions which were given by the court and find that the substance of appellant's tendered Instruction No. 2 is fully covered by court's preliminary Instruction No. 7. However, appellant here asserts that his Instruction No. 2 should, because of the importance of the case, have been given in the final charge to the jury not-

withstanding its subject matter had been covered by the court's Instruction No. 7. Paragraph 2 of Rule 1-7A of this court, 1954 Edition, provides that:

"2. The court may of its own motion and shall, if requested by either party, reread to the jury the instructions given pursuant to the provisions of the first paragraph of this section along with the other instructions given to the jury at the close of the case."

The record does not show that the appellant requested the trial court to read Instruction No. 7 at the close of the case. We do not consider that appellant's request to have his Instruction No. 2 given in the final charge to the jury is a request to "reread" an instruction within the meaning of Rule 1-7A, *supra*. We find no reversible error in the refusal of the trial court to give appellant's tendered Instruction No. 2.

The substance of appellant's tendered Instruction No. 4 is fully covered by the court's preliminary Instruction No. 11. Instructions No. 8 and No. 19 are covered, insofar as applicable to the evidence, by the court's Instruction No. 21; and appellant cannot complain of error, if any, in the refusal to give his tendered Instructions No. 7 and No. 9 because they pertained to murder in the first degree, and he was found guilty of murder in the second degree, thus he could not have been injured by such refusal.

Appellant's tendered Instructions Numbered 14, 15, 16 and 17 all pertain to the question of self-defense. Instruction No. 14 pertains to the defense of a member of the family and was properly refused because appellant testified that he was thinking only of his own safety at the time he fired the shots,

hence there was no evidence to support such Instruction No. 14.

Instructions Numbered 15, 16 and 17 are all covered by the court's Instruction No. 21. The trial court is not required to accept tendered instructions and give them in the exact language in which they are tendered. It may, so long as they are proper, give instructions in its own language, and when a subject is substantially covered in an instruction given by the court, it is not error to refuse one tendered by the defendant which is in substance the same but is couched in different language. *Hedrick* v. *State* (1951), 229 Ind. 381, 387, 98 N. E. 2d 906; *Taylor* v. *Fitzpatrick* (1956), 235 Ind. 238, 248, 132 N. E. 2d 919. This seems to us to be appellant's principal complaint about the refusal to give the last three instructions named.

For these reasons the refusal to give appellant's Instructions Numbered 14, 15, 16 and 17 was not error.

The objections to the trial court's ruling on appellant's tendered Instruction No. 11 are not discussed in the argument section of appellant's brief as required by Rule 2-17(e) and (f) of this court, 1954 Edition, hence they are waived. *Taylor* v. *Fitzpatrick* (1956), 235 Ind. 238, 248, 132 N. E. 2d 919.

Appellant's counsel have cited and quoted from numerous authorities in their brief. With the principles of law which they recite we have no quarrel. However, because the question of self-defense was one of fact to be determined by the jury from all the evidence and because the jury, as demonstrated by its verdict, did not believe the appellant's statement in self-defense as against other competent evidence in the record, none of such authorities sustain appellant's position in this appeal.

From the record here before us, it appears that appellant had a fair and impartial trial, in the county where the offense was committed and in which he resided. The regular judge who heard all the evidence and had the opportunity to observe the witnesses, denied appellant's motion for a new trial.

It is not within our power to weigh the evidence or to say which testimony the jury should have believed.

The burden was upon appellant here to show reversible error. This he has failed to do.

The verdict is sustained by sufficient evidence and it is not contrary to law, hence the judgment must be affirmed.

Judgment affirmed.

NOTE.—Reported in 146 N. E. 2d 811.