SCHLEGEL *v.* STATE OF INDIANA.

[No. 29,564. Filed May 15, 1958. Rehearing denied June 18, 1958.]

---

*Clarence E. Benadum,* of Muncie, and *Orville A. Pursley,* of Hartford City, for appellant.

*Edwin K. Steers,* Attorney General, and *Merl M. Wall,* Deputy Attorney General, for appellee.

BOBBITT, J.—Appellant was charged by indictment with murder in the second degree under Acts 1905, ch. 169, §350, p. 584, being §10-3404, Burns' 1956 Replacement, tried by jury, convicted as charged and sentenced to life imprisonment in the Indiana State Prison.

Three questions are here presented for our consideration.

*First:* Appellant asserts that there is no evidence to establish the *corpus delicti.*

"Proof of the *'corpus delicti'* means proof that the specific crime charged has actually been committed by someone." *Parker* v. *State* (1950), 228 Ind. 1, 6, 88 N. E. 2d 556, 89 N. E. 2d 442; *Dennis* v. *State* (1952), 230 Ind. 210, 216, 102 N. E. 2d 650.

The coroner of Blackford County, Indiana, where the alleged crime was committed, testified that he was called on May 2, 1956, to go to the J & K Gravel Pit, a mile south of Royerton, Indiana, on State Road 3, where he saw two men in a boat searching for something on the bottom of the gravel pit; that these men found a two-toned brown Chevrolet automobile in which were two bodies—a man clothed in overalls, jacket, and a pair of high top shoes, and a woman clothed in a nightgown; and that these bodies were taken to Ball Memorial Hospital at Muncie, Indiana, where they were identified by appellant as being the bodies of Darrel Spade and his wife, Mary Spade. This witness further testified that he was present when an autopsy was performed and that he observed a gunshot

wound behind the right ear on Darrel Spade's skull, and that there was something that smelled like burned gun powder and searing around the wound; and, further, that deceased's jacket had been perforated and his suspender on the left side severed.

A physician and pathologist at Ball Memorial Hospital at Muncie testified that he was requested to perform an autopsy on Darrel and Mary Spade, and that he found wounds on Darrel Spade's left shoulder and neck and that his death was caused by "a shot that traversed his neck."

We believe this evidence is sufficient to show that the crime charged in the indictment herein was actually committed by someone.

*Second:* Appellant further asserts that the verdict is contrary to law because the evidence was insufficient to show that the shooting was done purposely and maliciously.

". . . intent and purpose to kill may be inferred from the deliberate use of a deadly weapon in a manner calculated to produce death" and malice may be inferred from the use of the shotgun which caused the death as charged in the indictment herein. *Pitts* v. *State* (1939), 216 Ind. 168, 170, 171, 23 N. E. 2d 673; *Myles* v. *State* (1955), 234 Ind. 129, 133, 124 N. E. 2d 205.

There is substantial evidence in the record from which the jury could have found that the mortal wound was inflicted upon the deceased Spade by a deadly weapon in the hands of appellant, and from this malice and intent could have been inferred.

*Third:* Appellant further asserts that at the time he fired the shots he had reasonable cause to believe that

: he was in great danger of receiving bodily harm
█ or losing his life, and that he shot appellant in
· self-defense.

"Whether or not appellant herein shot and killed
the deceased in self-defense was an ultimate fact
solely for the determination of the jury from the
evidence in this case." *Bange* v. *State* (1958), 237
Ind. 422, 146 N. E. 2d 811, 812. See also : *Myles* v. ·
*State; supra,* at page 133 of 234 Ind.

If the verdict herein is supported by substantial evi-
dence of probative value it will not be disturbed on
appeal.

There is evidence in the record from which the jury
could have found that appellant lived with Darrel and
Mary Spade, his brother-in-law and sister, on their
farm; that on the night of April 24, 1956 appellant
returned to the farm about 9:30 P.M.; that when he
backed into the farm yard he saw what he thought
was the deceased Darrel Spade "striking at an object"
on the ground which he later learned was his sister
Mary; that appellant walked toward Spade yelling at
him, whereupon the deceased started toward appellant
"yelling," "You're next;" and that appellant started
running toward the northwest corner of the barn. The
deceased then "stopped what he was doing" and started
after appellant, and as he (appellant) "rounded the
northwest corner of the barn," the doors to the
entrance to the corn crib were open and he dodged
behind the corn sheller which was sitting in the
entrance to the corn crib.

A State police detective testified, as a witness for
the State, concerning a conversation which he had with
appellant in the presence of a deputy sheriff at the
Spade home on May 2, 1956, in pertinent part, as fol-
lows :

"Q. Officer Warnock, I believe your last testimony was the defendant told you that he ran into this corn crib there behind the corn sheller displayed to the jury by the photograph. You may continue with your questioning or statements made to you by the defendant on that particular day.

"A. While Chester was crouched behind the corn sheller he told us Darrel went by the open door, went on over to the main barn doors at the north end of the barn.

"Q. Step forward and point that out for the Court and the Jury.

"A. (Pointing to the large sliding doors of the barn) These doors here, where he entered the barn, turned on the lights. Chester said while he was in there he heard him say, 'I am going to the house and get a gun and kill you.' After that he turned the light off, returned outside and was coming back past the open door where the corn sheller was located and at that point when he went by the open doors and was beyond that, Chester said that he evidently rolled on a corn cob or an ear of corn as it made a noise Darrel glanced back, at that time he stepped out in a crouched position and fired the shot gun at Darrel striking him in the upper left shoulder knocking him down.

. . . .

"A. He told us as Darrel moved by this door (pointing) he evidently stepped on an ear of corn that moved and that attracted Darrel's attention at that time Chester stepped out from behind the corn sheller, shot Darrel as he was evidently in this position here, knocking him down.

"Q. Did the defendant tell you where the decedent, Darrel Spade, fell on the ground in relation to the northwest corner of this farm?

"A. He told us fell forward.

"Q. Which would be to the west?

"A. Yes and fell with his hand under his face sorta to the side his head was to the side and

Chester evidently stepped out a little further he told us Darrel was still mumbling something about going to the house to get a gun and Chester said at that time he placed the gun at Darrel's head and fired again."

The deputy sheriff who was present during the conversation above mentioned also testified as a witness for the State concerning this conversation, in pertinent part, as follows:

"Q. Relate next what the defendant told you.

"A. He said that Darrel started after him from this spot up here by the buildings towards him and Chester went into the barn behind the corn sheller and he said Darrel went on past here into the other barn that he said something while he was in there like he would find him and get a gun. He said Darrel then turned and came past him and said, 'I am going to the house and get a gun and kill you' as he went past Chester had already picked up the shot gun it was laying there on some boards on the east side and when Darrel— he was still talking—when he went past— Chester told us his foot rolled on a corn cob or an ear of corn and Darrel glanced in like this to see him and that is when he stepped out and shot him.

"Q. Did Chester at that time say anything about Darrell turning the light on in the barn?

"A. No, I don't remember that.

"Q. Did he, at that time, describe how he shot him?

"A. He shot him first time and he said he fell and he loaded up the gun and stepped over him and shot him again and when after he shot him he set the gun up and run up to where Mary was."

Appellant testified, on cross-examination, relative to the circumstances covered by the conversation above mentioned, as follows:

"Q. He made some statements in the barn in addition to his curse words did he not?

"A. He did make some.

"Q. Tell the Court and Jury those statements.

"A. As I recall he said something about going to the house and getting a gun and killing me. I couldn't say for sure if he said he was going to the house. He said he was going to get a gun.

. . . .

"Q. Chester when you fired the first time what did Darrel do?

"A. Well, then is when he said he would get a gun and kill me. I don't think he—he might have used one or two swear words when he said it but I couldn't say for sure that was after I shot the first time I didn't think I hit him.

"Q. Where were you when you fired that first shot with reference to being inside or outside of the corn crib?

"A. I was inside the corn crib.

. . . .

"Q. You told me prior to our recess you fired both shots at Darrel Spade while you were in the corn crib did I understand you correctly?

"A. I didn't say that, that's wrong.

"Q. Then you just tell me whether both shots were fired inside the corn crib or were they not?

"A. The second shot was fired when I was running at him.

. . . .

"Q. Then you indicate for the Jury the position that Darrel Spade was in at the time you fired the first blast.

"A. As far as I know he was standing right here. Here is the opening of the corn crib I would say he was standing 2 or 3 feet from the barn and he had the mattock in his hand and when the corn started to roll he raised the mattock and turned like that and I fired.

. . . .

"Q. Now, Chester, I don't mind if you would take the stand again. Now the first shot was fired?

"A. Yes.

"Q. Tell me what, if anything, Darrel did.

"A. As I recall he took one hand off the handle and had it to the side of his face. The hand was underneath of him when he come down. When I come back to him one hand was under his cheek.

• • • •

"Q. Did Darrel Spade turn around and run toward you?

"A. No he did not.

"Q. Was Darrel standing at exactly the same place on the ground, Chester, when you fired the second shot that he was standing when you fired the first shot?

"A. He was.

"Q. He never moved?

"A. Some, but I don't know how much.

• • • •

"Q. You fired the first blast?

"A. I did.

"Q. And then you walked out of the corn crib?

"A. I loaded while in the corn crib and was running toward him.

• • • •

"Q. You don't recall pulling back the trigger of the gun? Undoubtedly that happened just as the hand came back automatically?

"A. When I was running at him it all happened so fast I wouldn't want to say whether I pulled my finger or not.

"Q. You are running toward Darrel and was going to fire this fatal blast?

"A. I didn't say I was intending to, no.

"Q. In any event you are leaving the corn crib, are you not?

"A. I was running at him.

• • • •

"Q. How close were you when you fired that second shot?

"A. I can't say.

"Q. Yesterday you did say a foot.

"A. I was somewhere within that I never said a foot or 6 inches or closer or farther away."

When danger of death or great bodily harm ceases, the right of self-defense ceases with it. 1 Warren on Homicide (Permanent Edition), §156, p. 754.

Even if the first shot had been fired in self-defense, the second would not have been if it were fired when not necessary for appellant to further defend himself. *Bange v. State, supra* (1958), 237 Ind. 422, 146 N. E. 2d 811; *Meurer v. The State* (1891), 129 Ind. 587, 29 N. E. 392; *Chestnut v. State* (1900), 112 Ga. 366, 37 S. E. 384; *Caughron v. State* (1911), 99 Ark. 462, 139 S. W. 315.

Appellant cites *Flick v. State* (1935), 207 Ind. 473, 193 N. E. 603, in support of his assertion that he killed the deceased Spade in self-defense. Since it is not pointed out in appellant's brief wherein the case cited supports his position, we must assume that he is relying upon the rule as stated at pages 476, 477 of 207 Ind., as follows:

"It is sufficient to invoke the rule of self-defense, when it is shown that he is in a place he had a right to be, and without fault on his part, is violently assaulted by another and under such circumstances that he believes or had reasonable cause to believe that he is in danger of great bodily harm or of losing his life, then he may, without retreating, repel force by force to any extent which is reasonably necessary. He may in such cases make use of a deadly weapon *if its use is reasonably necessary,* in the reasonable defense of himself, and if he inflicts a severe wound on his assailant

or even causes his death, he will be excused there-
from whether he believes it necessary to inflict
the particular wound or not, or causes the death of
his assailant." Citing authorities. (Our italics.)

This correctly states the rule of self-defense in Indiana, and the rule as there stated was affirmed in substance by this court recently in *Bange* v. *State, supra* (1958), 237 Ind. 422, 146 N. E. 2d 811, 812.

We must then determine whether the rule as stated in *Flick* v. *State, supra,* and *Bange* v. *State, supra,* applies to the facts as disclosed by the record in this case.

The jury was not compelled to believe appellant's testimony that he shot the deceased in self-defense; and under the circumstances here, it was for them to determine from all the evidence whether it was reasonably necessary for appellant to fire the shots at the deceased in defense of himself.

The jury might reasonably have found from the evidence as set out above, that appellant fired the first shot at a time when he believed he was in danger of great bodily harm. It likewise could have found that the second shot was not necessary to appellant's further defense of himself.

By appellant's own testimony he was pursuing the deceased at the time the second shot was fired. If, as the State police officer and the deputy sheriff testified, the deceased was felled by the first shot and appellant rushed at him and fired the second shot while deceased was lying on the ground, it would seem that the danger of death or great bodily harm to appellant, if any, had ceased with the firing of the first shot and the right of self-defense ceased with it. The evidence here is sufficient to sustain such conclusion by the jury.

There is sufficient evidence, if believed by the jury, to sustain its verdict and it is not within our power to weigh the evidence or to say what testimony the jury should have believed.

The burden was upon appellant to show reversible error. This he has failed to do and the judgment must be affirmed.

Judgment affirmed.

Emmert, C. J., Landis, Achor and Arterburn, JJ., concur.

NOTE.—Reported in 150 N. E. 2d 563.