MILLER *v.* STATE OF INDIANA.

[No. 30,100. Filed April 11, 1962.]

*Robert S. McCain* and *David Keller,* both of Fort Wayne, for appellant.

*Edwin K. Steers,* Attorney General, and *Carl E. Van Dorn,* Deputy Attorney General, for appellee.

BOBBITT, J.—Appellant was charged by indictment with murder in the second degree under Acts 1905, ch. 169, §350, p. 584, being §10-3404, Burns' 1956 Replacement, tried by jury, found guilty as charged and sentenced accordingly.

The sole error assigned is the overruling of appellant's motion for a new trial.

We need be concerned only with the specifications for a new trial numbered 4 and 5, which are: (4) that the verdict of the jury is not sustained by sufficient evidence; and (5) is contrary to law.

Appellant asserts that the evidence is not sufficient to sustain the verdict of the jury on the essential element of malice.

Section 10-3404, *supra,* provides:

"Whoever, purposely and *maliciously,* but without premeditation, kills any human being, is guilty of murder in the second degree, and, on conviction, shall be imprisoned in the state prison during life." (Our italics.)

There is no direct evidence of malice in the record here, and if the verdict of the jury on this element of the crime is to be sustained it must be done by circumstantial evidence only.

It is contended by the State that malice is shown here by the use of a deadly weapon.

This court early adopted the rule that if an act of killing a human being "is perpetrated with a deadly

weapon, so used as likely to produce death, the purpose to kill may be inferred from the act; . . ." *Murphy* v. *State* (1869), 31 Ind. 511, 514.

This rule has been consistently followed by this court and the current version is succinctly stated in *Martin* v. *State* (1957), 236 Ind. 504, 507, 141 N. E. 2d 455, as follows:

"Malice may be inferred from the intentional use of a deadly weapon in such a manner as likely to cause death." See also: *Landreth* v. *State* (1930), 201 Ind. 691, 697, 171 N. E. 192, 72 A. L. R. 891; *Dickinson* v. *State* (1944), 222 Ind. 551, 555, 55 N. E. 2d 325; *Stice* v. *State* (1950), 228 Ind. 144, 150, 89 N. E. 2d 915; *May* v. *State* (1953), 232 Ind. 523, 526, 112 N. E. 2d 439; *Myles* v. *State* (1955), 234 Ind. 129, 133, 124 N. E. 2d 205 (Cert. denied, 349 U. S. 932, 99 L. Ed. 1262, 75 S. Ct. 776) ; *Schlegel* v. *State* (1958), 238 Ind. 374, 377, 150 N. E. 2d 563.

As has been said so many times by this court, we "will not weigh evidence when its sufficiency is questioned on appeal, but will examine the record to determine whether there is any evidence of probative value or any reasonable inferences which may be properly drawn therefrom which would sustain the verdict of the jury or the decision of the trial court." *Mattingly* v. *State* (1952), 230 Ind. 431, 438, 104 N. E. 2d 721; *Cross, Jr.* v. *State of Indiana* (1956), 235 Ind. 611, 614, 137 N. E. 2d 32.

It is also settled that if the verdict is supported by substantial evidence of probative value it will not be disturbed on appeal. *Schlegel* v. *State, supra* (1958), 238 Ind. 374, 378, 150 N. E. 2d 563.

A brief statement of the facts leading up to the shooting is necessary to a better understanding of the

evidence upon which the State relies to support the conviction herein.

Appellant was employed as a bartender at the Club Manhattan, a tavern located in the "rolling mill" district of Fort Wayne, Indiana, and he was on duty the evening of the shooting on December 26, 1958.

Sometime between 7 and 8 o'clock P. M. on December 26, 1958, the deceased, Harrison Tinker, (herein after referred to as the deceased) his brother, William "Snoop" Tinker, and William's wife were in the tavern drinking. They were causing some disturbance, and the club "bouncer", one Eugene Wright, went over to the booth they were occupying and asked them to quiet down or leave. They left the tavern. About 11 o'clock that same evening they returned. When they entered the front door of the tavern William Tinker was "chasing" his wife, who ran to the back of the tavern and into the ladies' rest room. William followed her into the rest room, and "pulled her out." She then ran down the aisle and over to the telephone booth which was at the end of the aisle to the right and behind a cigarette machine. Her husband followed her to the telephone booth where they continued scuffling and fighting.

After William and his wife reached the telephone booth, the deceased, who weighed 280 pounds, stationed himself in the aisle directly in front of the cigarette machine which blocked the entrance to the telephone booth.

The "bouncer" (Wright) attempted to go down the aisle to the telephone booth to reach William Tinker and his wife to break up the fight, but was stopped by the deceased who "pulled a knife" with a 2 1/2 or

3 inch blade, and said to Wright, "This is my brother, Gene, don't touch him."

The deceased's attention was drawn away from Wright and at that time he (Wright) jumped over the back of the end booth, and when he was almost to the door of the phone booth he heard a shot.

Following is a summary of the evidence introduced by the State and upon which it relies.

Two eyewitnesses testified for the State. Willie Craig, who was standing across the room from the deceased, Harrison Tinker, testified that while deceased and his brother were "arguing" appellant, Miller, "came from behind the bar" and went up the aisle where the deceased was standing in front of the cigarette machine, and as he approached the deceased appellant "told him to take his hand out of his pocket", to which deceased replied, that he had nothing in his pocket but keys, and as he took his hand out of his pocket he, Tinker, said, "I don't have anything in my hand only keys, man." This witness then testified that appellant "pulled his hand up . . . the gun went off" and shot the deceased, Harrison Tinker. Craig further testified that he saw no knife in the deceased's hand.

Henry Ford Underwood, the other eyewitness who testified for the State, came into the club a short time before the shooting and was standing in front of the door when he saw deceased standing by the cigarette machine and a man and woman "tussling" in the telephone booth. Underwood further testified that he first saw appellant, William Miller, behind the bar, then he left the bar and "rushed back there where this guy was and they was fighting and Tinker was standing up by this cigarette machine", and that appellant

told Tinker "to cut out that junk back there", and "this guy told Bill he was trying to get his wife out of there." "They mumbled something and Bill (appellant) got back off of him" and shot Tinker. This witness also testified that he did not see any knife in deceased's hand.

Dr. Louis A. Schneider, who performed a postmortem on the body of the deceased, stated in a stipulation introduced on behalf of the State, that "[t]here was a through and through wound of the right thumb and internally there was a rent in the peritoneum, which is the lining of the abdominal cavity, and a tract surrounded by a relatively fresh hemorrhage which ended in an area on the left side behind or on the other side of the vertebral column in the neighborhood of the 12th rib," and that in his opinion Tinker died from shock of the bullet.

Police Officers, Novitski and Lake, as witnesses for the State, testified that they saw the deceased after he had gone to the hospital and that two wounds were visible on him, one on the right thumb and the other on the right side of his stomach.

Police Officers Lake and King, as witnesses for the State, testified that they went to the Club Manhattan sometime between 9 and 10 o'clock on the morning of December 27, the day following the shooting, and interviewed Lorel L. Smeltzer, the owner of the club. Officer King testified that "before leaving he [Smeltzer] went behind the bar and brought out a knife and gave it to us." Officer Lake testified that after checking the safe, doors, etc., Smeltzer came back to the bar where he and Sergeant King were standing and "reached behind the bar and produced a knife" which he handed to Sergeant King. This knife was intro-

duced into evidence as State's Exhibit No. 10, and was identified by appellant, on cross-examination, as the one he picked up off the floor and put on the bar after the shooting.

Because of its importance we quote below, verbatim, the questions by the Deputy Prosecutor and answers by appellant, on cross-examination, concerning the knife.

"Q. Did I understand you to say that up to the time of this shooting you did not know Harrison Tinker, is that correct?

"A. I did not.

"Q. You learned his name afterwards?

"A. I did.

"Q. And so you shot at the man, didn't you, not a person that you knew as Harrison Tinker?

"A. I shot at a knife.

"Q. And not Harrison Tinker, though, because you didn't know Harrison Tinker at that time, did you?

"A. I did not.

"Q. I now hand you, Mr. Miller, a knife which the reporter has marked for purposes of identification as State's Exhibit No. 10. Will you look at that, please? Are you in a position to tell us whether or not this is the knife that you gave to Bud Smeltzer on the evening of December 26, 1958?

"A. That's the knife I picked up off the floor.

"Q. And is it the knife that you gave to Mr. Smeltzer?

"A. I didn't give it to him. I put it up on the bar."

The State introduced into evidence, as State's Exhibit No. 12, a statement by appellant made in the office of the Captain of Detectives in Fort Wayne, in the presence of two detectives, on the day following

the shooting. Parts pertinent to the issue here under consideration are as follows:

"Q. Now William tell us in your own words and in your own way the facts as they are in reference to the fatal shooting of Harrison Tinker M. C. age 31, of 1903 Smith Street at about 11:00 p.m. December 26, 1958 at the Club Manhattan 2402 Culbertson Street Fort Wayne Allen County Indiana.

"A. Last night I was working as a bartender at the Club Manhattan two fellows started a disturbance and left. Later on about a quarter of eleven they came back into the tavern. When they came back Bud called the bigger one over to the bar and told him not to start any more trouble in there. While Bud was talking to the big man the little man went over by the vendor and started to get on this girl over there. She broke away from him and ran to the ladies rest room. He went into the ladies rest room behind her and drug her out and he started a fight between the rest room and a cigarette machine. They fought and scuffled until they went into the telephone booth. I shouted at Gene and told him to break it up over there. The big fellow wouldn't let Gene get over to where they were scuffling. At that time I didn't know whether the big fellow had a knife, and Bud said to see if I couldn't help Gene. I went over there and asked him to stop it and I saw the big fellow had his right arm down by his side and I pushed him so I could get to the boy and the girl who was fighting, that's when he came with the knife and charged me. I told him that I didn't want any trouble, I just wanted to get the fight stopped. He kept coming toward me so I took my 32 calibre gun out of my left pants pocket and shot this man. After I shot the big man the little man said come on lets go. They turned to leave so I picked up the knife off of the floor the one the big fellow had and threw it behind the bar. They then went on out the door. During

the disturbance some people behind me bumped me and I dropped the gun on the floor and I never did find it. After they went out the door I went on behind the bar where Bud was, and Bud asked me if I hit him and I told him I thought I hit him in the arm because I was shooting at the knife. Bud said he saw some blood on this mans stomach and said he thought I hit him in the stomach. Fifteen or twenty minutes later the police came and talked to Bud.

"Q. I now show you a knife (indicating) with the initials of FK and the date of 12-27-58 and ask you is this the knife the big fellow had in his hand?

"A. Yes.

"Q. In the above story you mentioned the name of Bud, tell us this mans full name?

"A. Lorel L. Smeltzer, the owner of the Club Manhattan.

"Q. In the above story you also mentioned the name of Gene, tell us this mans full name.

"A. Eugene Wright, who was waiting tables and also a floor man."

Also, on cross-examination, appellant, in reply to questions by the Deputy Prosecuting Attorney, testified that he did not know Harrison Tinker at the time of the shooting, but learned his name afterwards; and that he did not shoot at the man but at the knife in his hand.

There is undisputed evidence that appellant was an expert shot with a pistol and that he had received medals as a sharpshooter and for expert markmanship while serving in the United States Army.

A careful consideration of the State's evidence as above summarized and quoted, forces us to the conclusion that there was no element of malice shown,

nor could any reasonable inference be drawn from the evidence that appellant maliciously killed the deceased, Harrison Tinker.

It is true that a deadly weapon was intentionally used here, but in our judgment it was not used in such a manner as was calculated to, or was likely to cause death.

Appellant's statement that he shot at the knife in decedent's hand is supported by testimony of the State's own witnesses that deceased was shot in the thumb of his right hand.

The negative statements of the State's two eyewitnesses that they did not see any knife in Tinker's hand is refuted by the physical evidence of the knife, introduced into evidence as State's Exhibit No. 10, and identified by appellant in answer to questions by the Deputy Prosecuor as the knife which he had picked up off the floor after Tinker was shot.

While we are not attempting to weigh the physical evidence here against the testimony of the two eyewitnesses, however, since the State produced the undisputed evidence that there was a knife that appellant picked up off the floor after the shooting and laid it on the bar; that defendant-appellant shot at the knife in the right hand of the deceased, and deceased was shot in the right thumb, these facts are established beyond dispute and can lead to but one conclusion and that is that appellant shot, not in a manner to cause death, but rather to disarm the deceased.

There is no evidence in the record here showing anger, hatred, or any elements of a purposeful malicious killing. On the contrary, the undisputed evidence introduced by the State is that appellant did not know

the deceased at the time of the shooting, and that appellant's mission in leaving the bar was undertaken at the request of his employer and for the purpose of helping to restore order in the tavern.

In our judgment no reasonable man could reach a different conclusion on these undisputed facts. It is our further opinion that the circumstances as shown by the record in this case do not support a reasonable inference of malice.

We recognize that the question of malice is one of fact for the jury to determine. *Landreth* v. *State, supra* (1930), 201 Ind. 691, 696, 171 N. E. 192, 72 A. L. R. 891. However, the verdict of the jury must be supported by substantial evidence of probative value. *Schlegel* v. *State, supra* (1958), 238 Ind. 374, 378, 150 N. E. 2d 563; *Todd* v. *State* (1951), 230 Ind. 85, 90, 101 N. E. 2d 922; *Yessen* v. *State* (1950), 228 Ind. 316, 319, 92 N. E. 2d 621.

The present case is distinguished from *Taylor* v. *State* (1929), 201 Ind. 241, 167 N. E. 133, in that there the victim, Cook, was shot in the "breast above his heart", and at page 244 of 201 Ind., this court said:

"Appellant's act of shooting Cook in a vital part of . . . Cook's body with so powerful a pistol that the shot passed through Cook's body shows a deliberate intent to bring about the probable consequences of the act. And the presumption of malice stands until rebutted by competent evidence."[1]

---

1. For other cases where the fatal injury was inflicted on a vital part of the body, and the circumstances were held to support an inference of malice, see: *Martin* v. *State* (1957), 236 Ind. 504, 141 N. E. 2d 455; *Landreth* v. *State* (1930), 201 Ind. 691, 171 N. E. 192, 72 A. L. R. 891; *Dickinson* v. *State* (1944), 222 Ind. 551, 55 N. E. 2d ·325; *Stice* v. *State* (1950), 228 Ind. 144, 89 N. E. 2d 915; *May* v. *State* (1953), 232 Ind. 523, 112 N. E. 2d 439; *Myles* v. *State* (1955), 234 Ind. 129, 124 N. E. 2d 205; *Schlegel* v. *State* (1958), 238 Ind. 374, 150 N. E. 2d 563; *Kiefer* v.

The shot by appellant in the present case was not directed to a vital part of the body of the deceased and was not fired in such a manner as likely to cause death.

In our judgment the evidence here is insufficient to sustain the verdict of the jury on the essential element of malice and for this reason the judgment of the trial court must be reversed.

Other questions properly raised by appellant are not likely to reoccur on a retrial and they are, therefore, not considered.

Judgment reversed with instructions to grant appellant's motion for a new trial.

Achor, C. J., Arterburn, Jackson and Landis, JJ., concur.

NOTE.—Reported in 181 N. E. 2d 633.

*State* (1958), 239 Ind. 103, 153 N. E. 2d 899, (Cert. denied, 366 U. S. 914, 6 L. Ed. 2d 238, 81 S. Ct. 1089); *Yarber* v. *State* (1962), 242 Ind. 616, 179 N. E. 2d 882.