HUTCHINSON *v*. STATE OF INDIANA.

[No. 30,693. Filed May 5, 1967.]

*Sherwood Blue* and *Janet L. Roberts,* of Indianapolis, for appellant.

*John J. Dillon,* Attorney General, and *Charles J. Deiter,* Deputy Attorney General, for appellee.

MOTE, J.—Appellant, James David Hutchinson, and one Karen Janet Dodd, were indicted jointly by the Grand Jury of Marion County, Indiana, on January 25, 1962, and charged with the first degree murder of one, Karrie Dodd, which indictment, omitting the formal parts, was as follows:

"The Grand Jury for the County of Marion in the State of Indiana, upon their oath do present that Karen Janet Dodd and James David Hutchinson on or about the 13th day of October, A.D. 1961, at and in the County of Marion and in the State of Indiana, did then and there unlawfully, feloniously, purposely and with premeditated malice kill and murder, Karrie Dodd, a human being by then and there unlawfully and feloniously, purposely and with premeditated malice, striking and beating at and against the body of the said Karrie Dodd, and did then and there and thereby inflict a mortal wound in and upon the body of the said Karrie Dodd, of which mortal wound the said Karrie Dodd, then and there and thereby died.

And so the Grand Jurors aforesaid, upon their oaths aforesaid, do say and charge that the said Karen Janet Dodd, and James David Hutchinson, in the manner and form and by the means aforesaid, unlawfully, feloniously, purposely and with premeditated malice did kill and murder the said Karrie Dodd, then and there being."

The parties were arrested and placed in jail. Efforts were made to release both by habeas corpus proceedings and by petition to be let to bail.

Eventually James David Hutchinson, one of the defendants, was tried separately by a jury who returned the verdict of guilty of second degree murder. Upon such judgment comes this appeal, after denial of motion for new trial. The assignment of errors, omitting the formal parts, is as follows:

"The Appellant avers that there is manifest error in the judgment and proceedings in this cause, which is prejudicial to the Appellant, in this:

1. The Court erred in overruling the Appellant's Motion for instructions to withdraw from the jury the issue of first degree murder and to discharge the Defendant from said offense.

2. The Court erred in overruling the Appellant's Motion for instructions to withdraw from the jury the issue of second degree murder and to discharge the Defendant from said offense.

3. The Court erred and abused its discretion in denying the Appellant's motion for instruction to withdraw from the jury the issue of second degree murder and to discharge the defendant from said offense, made at the conclusion of the opening statement by the prosecuting attorney for the State of Indiana.

4. The Court erred and abused its discretion in requiring the jury, when at the commencement thereof they were already physically and mentally depleted and fatigued, to continue deliberations for a period of more than five hours, from approximately 10:05 p.m., on April 16, 1964, until approximately 3:30 a.m. April 17, 1964, without providing said jurors with facility for rest and refreshment, and denying to them a night of sleep and renewal of mental and physical strength, so that said jurors were rendered deficient in power and capacity to give full, adequate, and fair consideration to the evidence and to the law in their deliberations upon said case, whereby the defendant-appellant was deprived of a fair and impartial verdict.

5. The Court erred in overruling and denying the Appellant's Motion in arrest of judgment.

6. The Court erred in disregarding the written statement of legal cause for not pronouncing sentence filed by the defendant-appellant on August 6, 1964.

7. The Court erred in sentencing the Appellant to the Indiana State Prison for life without pronouncing judgment on the verdict of the jury.

8. The Court erred in overruling the Appellant's Motion for a new trial.

9. The Court erred in sustaining the motion of Noble R. Pearcy, Prosecuting Attorney for the Nineteenth Judicial Circuit, to enter a Nolle Prosequi to the indictment against Karen Janet Dodd, joint co-defendant with James David Hutchinson for the reason: 'was re-submitted to the Grand Jury and no-billed' without first setting aside and verdict of the jury against the defendant-appellant James David Hutchinson and revoking the sentence imposed against said defendant, the appellant herein."

The decision herein necessarily must hinge upon the sufficiency of the evidence. The record indicates that appellant

was born in Indianapolis and enlisted in the Army, received training in various Army camps, and was sent to Korea after active hostilities had ceased where he spent thirteen months, after which he was returned to the United States and was stationed at Fort Lewis, near Seattle, Washington. Pending his discharge from the service he met Karen Janet Dodd, his codefendant, at a public dance hall and they promptly became intimately acquainted. Prior to his discharge the two of them had intimate relations at the home of her parents, in her own apartment, and at places of residence of her friends. After some time had elapsed, he proposed marriage and she then told him that she was married at the age of fifteen to one who was stationed on the East Coast and serving in the Navy, and that she had a child, Karrie Dodd, the decedent, then approximately three years of age.

The record is not exactly clear as to the date of discharge of appellant from the service, but thereafter appellant, together with Karen Janet Dodd and her daughter, Karrie Dodd, drove to El Paso, Texas, to see his mother and stepfather. They spent a week or ten days with them when trouble developed. Appellant's mother began to doubt lawful marriage of the two and also criticized the mother for her cruelty to the deceased. They then came to Indianapolis where appellant had a number of relatives with some of whom they first lived. For a short while thereafter, they resided in an apartment on North Alabama Street, in the City of Indianapolis, in an upstairs apartment of a building, which contained two upstairs apartments and two lower apartments, and was owned by a relative.

On Friday, October 13, 1961, appellant, then being an apprentice bricklayer, reported for duty, but due to the inclemency of the weather work ceased at about three o'clock. However, it appears that he remained at the job for about one-half hour to get the pay check due him.

Little Karrie Dodd was being attended that day by a baby

sitter, who in her own home also looked after several children. Appellant picked up little Karrie around 3:40 p.m. to 4:00 p.m. on that date and took her to their home on Edison Street. Apparently appellant had a date to meet Karen Janet Dodd, his codefendant, at her work at about 5:00 p.m. to 5:30 p.m. and, in preparation to do so, he not only looked after his own personal hygiene and clothing changes, but he also gave a bath to little Karrie. When her ablutions were completed, appellant dressed the little girl in her pajamas and took her in his automobile to pick up her mother at work. It developed afterward, as the three of them were on the way to market, that little Karrie was suffering agony for some then undisclosed reason. Appellant and Karen Janet Dodd altered their course and went to one of his relatives in order to call a physician. Such relative was not at home. They drove to the home of another of appellant's relatives who, after one look at the child, stated in effect "this child is very, very ill and you should take her immediately to the hospital." They promptly started to Community Hospital, and observing that the child was in extreme agony and almost unable to breathe, appellant, who was driving the automobile, and Karen Janet Dodd exchanged seats so the appellant could and he did attempt administering mouth to mouth resuscitation. Upon arrival at the hospital, or soon thereafter, the child was pronounced dead.

Suspicions were aroused and authority for an autopsy was sought and obtained from appellant and the mother. Statements were taken and both appellant and codefendant were arrested and placed in jail. Thereafter, they were indicted, as above stated.

The mother of the child at all times, until a short while before the trial of the appellant, maintained that appellant always had been kind to and had exhibited a loving disposition toward the child. Although appellant had been released from incarceration, his codefendant was not released until after

she changed her statement to the authorities, wherein she recited a long history of abuse by appellant to the child. Indeed, there was testimony that the child, particularly in the later days of her life, showed bruises on the temple and cheeks, as well as abrasions on the nose, but until Friday, October 13, 1961, the injuries to the child did not appear to be of real significance when measured by the injury done to the child on that date.

Evidence disclosed at the trial indicated that the child bore twenty-five or thirty marks such as could be inflicted by use of a belt, with the buckle on the end of the pendulum. There was a laceration of the liver, which could be caused by a blow from a blunt instrument, which led to speculation that the appellant may have hit the decedent with his fist. Except for the crying by the decedent, heard by the neighbors, and the lashing with a belt, admitted by appellant, the evidence is not too clear concerning just what happened during the period between 3:45 p.m. to perhaps 5:00 p.m. on October 13, 1961. We have found no evidence that the child was tossed around in the bathtub or in the washbowl where she might have been injured by the fixtures connected therewith. Appellant admitted that he used a belt to punish the little girl, but there appears to be no testimony which would account for the lacerated liver, except that the medical expert witness did speculate that such injury could have been caused by a sharp blow with a fist.

Despite the fact that the mother, a self-confessed perjurer and adultress, and child had returned to her native State of Washington for a couple of weeks during the summer of 1961, where she and the child could have remained, if her representations to the jury were correct that appellant was mean to and abused the decedent, she apparently voluntarily returned to Indiana and took up her life where she had left it.

We are not unmindful of the serious crime here committed, as shown by the evidence, and we have read the entire trans-

cript of testimony to ascertain whether the evidence is such that the verdict and judgment should be sustained. From our appraisal of the evidence, not by its weight but by the lack of it, we are not persuaded that the evidence meets the test and definition of second degree murder wherein reasonable people can be certain beyond a reasonable doubt that appellant purposely and maliciously killed the decedent. To survey the cold record and to study it leads us to the conclusion that a conviction of second degree murder would necessitate an inference upon a speculation, which the law does not permit.

In this case, we have but a few months immediately prior to October 13, 1961, for the consideration of the deeds of appellant and the codefendant, mother of the deceased, as such deeds relate to the death of the little girl. Before we enter into our discussion of such deeds and the occurrences, we want it strictly understood that in our consideration thereof, we "will not weigh evidence when its sufficiency is questioned on appeal, but will examine the record to determine whether there is any evidence of probative value, or any reasonable inferences which may be properly drawn therefrom, which would sustain the verdict of the jury or the decision of the trial court." *Mattingly* v. *State* (1952) 230 Ind. 431, 438, 104 N. E. 2d 721, 726; *Cross, Jr.* v. *State* (1956) 235 Ind. 611, 614, 137 N. E. 2d 32; *Miller* v. *State* (1962) 242 Ind. 678, 680, 181 N. E. 2d 633.

We also recognize the principle that if the verdict is supported by substantial evidence of probative value, it will not be disturbed on appeal. *Schlegel* v. *State* (1958) 238 Ind. 374, 378, 150 N. E. 2d 563.

So far as the record discloses, we are not dealing with a so-called deadly weapon used in such a manner as likely to cause death. *Landreth* v. *State* (1930) 201 Ind. 691, 697, 171 N. E. 192; 72 A. L. R. 891; *Dickinson* v. *State* (1944) 222 Ind. 551, 555, 55 N. E. 2d 325.

If we are to give full consideration to the one instrument, a belt, which admittedly was used, and to the second instrument, a fist, which was suggested to have been used to injure the decedent, we would be inclined to hold that the use of such belt neither brought about death nor was it a deadly weapon, per se. If we apply reasoning to the facts at hand, we would be required to speculate not only that the fist was used, but also that it was used in such a manner as likely to produce death. *Murphy* v. *State* (1869) 31 Ind. 511, 514; *Landreth* v. *State, supra; Schlegel* v. *State, supra; Myles* v. *State* (1955) 234 Ind. 129, 133, 124 N. E. 2d 205.

Having to speculate that the suggested weapon used was a fist, that it was a deadly weapon, and that it was so used as likely to produce death in order to meet the test of the statutory definition of second degree murder of which appellant was convicted, we then would have to *infer* the existence of *purpose to kill and malice,* conjointly used.

Furthermore, from the expert witness who suggested that a sharp blow from a fist could have lacerated the liver from which injury the decedent died, there is a great number of possibilities and a vast array of speculations as to how the liver organ was lacerated—in fact, they are almost boundless. We all know that injuries in and about bathtubs, showers and lavatories occur and appear to increase from year to year, and various statistics are available to support such statement. Falling in the bathtub, over the rim of same, falling against plumbing fixtures, slippery soap and water conditions, and physical weaknesses all take their toll, just as riders in automobiles receive injuries because of faulty engineering and design. There is no doubt that the little girl's liver was lacerated, but there is no substantial proof as to how the same was lacerated. That such injury may have occurred during the time she was having her bath is not doubted, but in order to find the necessary statutory purpose and malice for a second

degree murder conviction, we cannot conceive by speculation that appellant's fist was used in such a manner as to lacerate the liver, when considering the broad spectrum of possibilities.

To conclude that either purpose or malice may be inferred because of the long history of abuse to the little girl by appellant, as testified to by appellant's codefendant, would not be reasonable, particularly in view of the many statements which she made that appellant had always exhibited kindness and love for her child, as well as the mute evidence contained in one of the exhibits—a photograph of the backseat of the automobile which displays at least one toy or plaything for the decedent.

Despite the fact that there are authorities which may appear to indicate otherwise, to-wit: *Indian Creek Coal, etc., Co. v. Calvert* (1918) 68 Ind. App. 474, 119 N. E. 519, 525, 120 N. E. 709; *Orey v .Mutual Life Insurance Co. of N.Y.* (1939) 215 Ind. 305, 19 N. E. 547, we think we are required to hold that the facts in this particular appeal will not permit inferences upon a speculation. In treating the subject of whether an inference may be drawn from an inference, it was said in *Orey v. Mutual Life Insurance Co. of N.Y., supra,* at p. 309: "There is no such rule; nor can be," that is, there is no rule against drawing an inference from an inference, citing as authority Wigmore on Evidence, 2d Ed., Vol. 1, § 41, pp. 258, 259.

Quoting further from *Orey v. Mutual Life Insurance Co. of N.Y., supra,* it is said:

"In an extensive note on the subject in 95 A.L.R., p. 162, it is said on page 182: 'It seems clear, after examination of all of the cases which have discussed the question, that there is no such general rule in the sense in which the language itself implies, and that if, in a sense, such a rule may be said to exist, the phraseology used to express it is inaccurate and misleading, and the meaning is quite different than appears upon its face. The courts have apparently often used this phraseology merely as a convenient way of

disposing of evidence which it regarded as too remote or uncertain to prove the ultimate facts at issue. The language has become a sort of judicial slogan, used carelessly, inaccurately, and to the confusion of the profession. The statement of the rule in many of the cases, that an inference cannot be based on an inference, shows that what is meant primarily is that an inference cannot be based upon evidence which is uncertain or speculative, or which raises merely a conjecture or possibility.' In the instant case, if the testimony of the expert, who said that the hernia could have been caused by violent external means only, is eliminated, it leaves only the evidence that it might have been caused either by violent external injury, which might be assumed to have been accidental, or by an unusual strain, which might be assumed to have been the result of a voluntary act. The jury might infer that it was one or the other, but a determination without further evidence that it was one rather than the other would depend upon mere speculation or guess, and the trior of facts is not permitted to indulge in such inferences. A fact may sometimes be established by circumstantial evidence more firmly and thoroughly than by direct but conflicting evidence, and when a fact is so established by inference it is as logical and reasonable a basis for further inference as a fact established by direct evidence."

Although we have cited above a statement concerning the drawing of an inference upon an inference, which appears to be proper, at least under certain conditions and circumstances, the fault we find with the evidence in this case, from a legal point of view, is that the jury was required to speculate on an inference or speculate on speculation, which often leads to error, and in this case we think it did lead to error.

The difference between the definitions of first degree murder and second degree murder, as defined by our Statutes, is not broad. In first degree murder, there must be *premeditated malice,* and in second degree murder, there must be both *purpose and malice,* and as above stated, malice may be inferred. The use of a deadly weapon may be sufficient to infer malice, but we are inclined to view that

proof of purpose, although permitted by circumstantial evidence, will not permit speculation.

We reached the conclusion herein that the facts and inferences to be drawn therefrom, as shown by the record, properly lead only to a reasonable conclusion by reasonable people, beyond a reasonable doubt, that appellant was guilty only of using excessive means of punishment of a child, which excessive means brought about her death, and that the only reasonable conclusion which may be drawn from the evidence and necessary inferences is that the appellant was guilty of involuntary manslaughter.

This Court cannot and does not concern itself with the credibility of the mother of the decedent. The fact that she was an admitted perjurer and guilty of adultery can have only our passing observation. The fact remains in our minds that this appellant was guilty only of involuntary manslaughter, as shown by substantial evidence. Manslaughter being an includable offense (see: *Ritchie* v. *State* (1963) 243 Ind. 614, 189 N. E. 2d 575) in the charge or indictment against appellant, it is now directed that the trial court modify its judgment and verdict of the jury, finding appellant guilty of second degree murder, by reducing it to a lesser included offense of involuntary manslaughter under Burns' Stat. § 10-3405 and to sentence appellant accordingly.

Arterburn, C. J. and Myers, J., concur.

Hunter, J., dissents, with opinion.

Jackson, J., not participating.

### DISSENTING OPINION.

HUNTER, J.—I must respectfully dissent from the majority opinion for the reasons hereinafter set forth.

It would appear that the facts at bar and the issues are capable of three (3) lines of reasoning upon which judicial minds reasonably might differ. They are as follows:

(1) There is sufficient evidence and reasonable inferences to be adduced therefrom to authorize a finding by the jury that the defendant committed an act of homicide by killing the little three (3) year old girl, Karrie Dodd. There is also sufficient evidence in the circumstances of the killing when coupled with a history of jealously, prior acts of physical abuse, and cruelty to allow the jury as a matter of law to imply malice and purpose; therefore, the verdict of second degree murder should be upheld. (or)

(2) The evidence is not sufficient to support a finding that the defendant committed *any* act which resulted in the death of the little girl. Therefore, the verdict should be reversed and the defendant on the evidence presented by the record should be acquitted. (or)

(3) There is sufficient evidence and legitimate inferences to be drawn therefrom to authorize a determination that the defendant committed the act which resulted in the death of the child. However, the circumstances surrounding the commission of the act of killing were insufficient to legally imply malice and purpose. Upon such reasoning the court should reduce the second degree murder conviction to involuntary manslaughter as a. lesser included offense or order a new trial for the defendant.

At the outset it is my position that the first of the three lines of reasoning as outlined immediately above should be the result in this appeal. Furthermore, I believe it incumbent upon me to attempt to demonstrate the error in the majority opinion by which they have reached an erroneous conclusion in the third line of reasoning above.

The majority opinion is extremely ambiguous and obviously inconsistent for the following reasons: (a) within their discussion of evidence it appears at certain points that they fail to find any evidence to support the fact that the defendant committed any wrongful act of homicide. It would then logically follow that the defendant could not properly be convicted of any form of criminal homicide. However, the majority concludes that the defendant was guilty of involuntary manslaughter rather than second degree murder which

is logically inconsistent with the major part of its discussion of the evidence. My interpretation of the majority opinion in this regard seems to be solidly based in view of the following excerpts from said opinion:

"Except for the crying by the decedent, heard by neighbors and the lashing with a belt, admitted by appellant, the evidence is not too clear concerning just what happened during the period between 3:45 P.M. to perhaps 5:00 P.M. on October 13, 1961. We have found no evidence that the child was tossed around in the bathtub or in the wash bowl where she might have been injured by the fixtures connected therewith. Appellant admitted that he used the belt to punish the little girl, but there appears to be no testimony which could account for the lacerated liver, except that the medical expert witness did speculate that such injury could have been caused by a sharp blow with a fist. . . .

Furthermore, from the expert witness who suggested that a sharp blow from a fist could have lacerated the liver from which injury the decedent died, there is a great number of possibilities and a vast array of speculations as to how the liver organ was lacerated—in fact, they are almost boundless. We all know that injuries in and about bathtubs, showers and lavatories occur and appear to increase from year to year, and various statistics are available to support such statement. Falling in the bathtub, over the rim of same, falling against plumbing fixtures, slippery soap and water conditions, and physical weaknesses all take their toll, just as riders in automobiles receive injuries because of faulty engineering and design. There is no doubt that the little girl's liver was lacerated, but there is no substantial proof as to how the same was lacerated. That such injury may have occurred during the time she was having her bath is not doubted, but in order to find the necessary statutory purpose and malice for a second degree murder conviction, we cannot conceive by speculation that appellant's fist was used in such a manner as to lacerate the liver, when considering the broad spectrum of possibilities."

(b) In stating that there is insufficient evidence that the appellant killed the little girl by a blow by his fist or another object with sufficient force to rupture the liver, the majority states that this would require an inference based on speculation. The majority relies on the adage of "an inference based

on an inference." However, what the majority seemingly is stating is that in their view there is insufficient evidence to demonstrate a manner of killing from which malice and purpose can be inferred. They finally conclude that the homicide was committed in such a manner that the defendant should only. have been convicted of involuntary manslaughter. *It should be noted that at no place in the opinion is the exact means of death stated or the wrongful act described* other than, "the appellant was guilty only of using excessive means of punishment. . . ."

However, since the various means of death must all be based on the same evidence, either it is too speculative to infer death by some wrongful act or it is not so speculative. In the latter event, if the jury found the means to be in one manner which would support second degree murder, this court can not weigh the evidence and substitute its own finding that the act was done in another unspecified manner.

It would seem that the majority opinion is weighing the evidence. This clearly demonstrated by the following language in the opinion:

> "To conclude that either purpose or malice may be inferred because of the long history of abuse to the little girl by appellant, as testified to by appellant's codefendant, would not be reasonable, particularly in view of the many statements which she made that appellant had always exhibited kindness and love for her child, as well as the mute evidence contained in one of the exhibits—a photograph of the backseat of the automobile which displays at least one toy or plaything for the decedent."

If the evidence is sufficient to establish that the appellant in fact committed some wrongful act which resulted in the child's death, then it is for the jury to determine the exact means.

(c) An additional error is to be found in that the majority opinion wholly fails to discuss the remaining errors (other than the sufficiency of the evidence) asserted by the defendant on this appeal.

(d)  Nowhere within the majority opinion do they state that even if the appellant hit the child with his fist, causing her death, that this would be insufficient evidence or present circumstance insufficient to imply malice and purpose. Again the majority opinion, in its most consistent parts, states that there is insufficient evidence to support the fact that the defendant in fact committed any wrongful act which resulted in her death. However, the most logical manner to change the conviction from second degree murder to involuntary manslaughter is to state that the circumstances of the death (that being a blow of sufficient force to rupture the liver) are insufficient as a matter of law to imply malice.

In what follows, it shall be demonstrated that the evidence is sufficient to support the fact that the appellant killed the little girl with his fist, by hitting her with sufficient force to rupture her liver, and that as a matter of law the circumstances surrounding the death of the little girl are sufficient to imply malice and purpose.

The appellant's chief contention raises the question of the sufficiency of the evidence to support the conviction for second degree murder in that such evidence fails to demonstrate (1) that he killed the child, (2) that he purposefully killed her, and (3) that he did so with malice.

All the above are questions of fact for the jury. *Baker* v. *State* (1964), 245 Ind. 129, 195 N. E. 2d 91; *Wahl* v. *State* (1951), 229, Ind. 521, 98 N. E. 2d 671. The leading case of *Baker* v. *State* (1956), 236 Ind. 55, 138 N. E. 2d 641 clearly defines our duty in regard to questions concerning the sufficiency of evidence. While this court will not weigh the evidence, it must be determined if there was substantial evidence of probative value from which the jury could have inferred the guilt of the appellant. By substantial evidence, I mean more than "seeming or imaginary." The rule is that *a verdict on which reasonable men might differ will not be set aside. However, if no reasonable man could find that the evi-*

*dence has proved an accused guilty beyond a reasonable doubt, then the verdict is not sustained by sufficient evidence.* Additionally, it should be stated that to prove a fact or allegation beyond a reasonable doubt requires more than proof by a preponderance of the evidence. See also *Epps* v. *State* (1963), 244 Ind. 515, 526, 192 N. E. 2d 459; *Anderson* v. *State* (1959), 239 Ind. 372, 378, 156 N. E. 2d 384.

The record contains the following evidence as viewed most favorable to the State: the appellant and Karen Dodd cohabitated while the woman was married to another man. Karrie Dodd was Karen Dodd's three year old child by marriage; but the appellant has assumed a father role to the child. On the afternoon of October 13, 1961, the appellant picked up Karrie Dodd from the babysitter's home at approximately 3:30 P.M. The babysitter testified that the child had not been injured while in her care since 7:30 A.M. that morning. The appellant and the child went to their residence where they remained until they went to pick up the child's mother at 5:30 P.M. the same afternoon. The mother of the child stated that when she got into the car the child was lying in the back seat seemingly asleep but her eyes were half open. After a period of time and other irrelevant occurrences and concluding that something was seriously wrong with the child, Karen Dodd and the appellant took her to a hospital, arriving at 6:35 P.M. to 6:40 P.M. The child died shortly thereafter.

The doctor who examined her at the hospital immediately after her arrival testified that there were 25 to 30 bruises on the front of the child's body. The bruises were oval in shape with a small abrasion in the center of each. The bruises were relatively fresh occurring within the last 24 hours. On the basis of the fact that the abrasions within the bruises were still fresh and had not yet begun to scab over, the doctor testified that the causation of the bruises had occurred even more recent than the past 24 hours. The same doctor testified

that the cause of the bruises was traumatic and not natural, probably inflicted by some kind of an instrument, such as a belt buckle.

Subsequently, an autopsy was performed. The doctor who did the autopsy testified that the cause of death was a ruptured liver which was caused by a forceful blow of some kind, normally resulting from falls from a building at a height of several stories, or being run over by a car; in other words some forceful blow or impact. The doctor also testified that death normally results from this type of injury in a few minutes to a few hours. Based on the assumptions that the child was not injured at 3:30 P.M. and that she died at 6:20 P.M., the doctor testified that the injury must have occurred between 3:30 P.M. and 6:20 P.M. The doctor also stated that the testimony of Karen Dodd as to the condition of the child when she got in the car at 5:30 P.M. indicated that the child was in a state of shock which normally occurs after an injury of this type.

Consequently, the evidence clearly demonstrates that the child was in the exclusive custody of the appellant for the majority of time during which the doctor testified that the injury causing death occurred. The appellant attempted to show that an accident occurred after he and the child picked up the mother which might have explained the death. While the appellant and Karen Dodd were in the car with the child, the girl fell from either the top of the front seat or from the back seat to the floor of the car onto some bottles. However, the doctor testified that it was "highly improbable" that such a fall could have caused the injury from which the child's death resulted. Additionally, the doctor testified that the condition of the child when the mother got in the car as testified to by her indicated that the child was in a state of shock which would be due to the hemorrhaging in the ruptured liver. The jury could have reasonably inferred and concluded beyond a reasonable doubt that the injury occurred

while the child was with the appellant between 3:30 P.M. and 5:30 P.M. and that the above incident had no relation to the child's death.

It remains to examine the evidence which might demonstrate that the appellant in fact killed the child, and did such with purpose and malice. First, there is evidence in the record as to the manner in which a liver is normally ruptured, i.e., a very forceful impact of some kind. Second, the appellant in relating the events that transpired while the child was with him between 3:30 and 5:30 P.M. does not state any incident which might otherwise explain the ruptured liver, i.e., the jury could have reasonably inferred and concluded beyond a reasonable doubt that no accident occurred during this period. Third, there is evidence which demonstrated previous acts of violence by the appellant toward the child such as hitting her in the stomach with a closed fist; slapping her in the face with undue force; and other such incidents, which demonstrates the appellant's predisposition to such violent acts as resulted in her death. Fourth, evidence indicates that a neighbor heard a child's scream coming from the appellant's residence between the hours of 3:30 and 5:30 P.M. under circumstance from which it would be reasonable to infer that it was the child who screamed. Fifth, there is evidence that he was jealous of the child. The appellant's wife testified that he stated that this was the reason for his mistreatment of the child. From such circumstantial evidence reasonable men could conclude beyond a reasonable doubt that the appellant inflicted a forceful blow with his fist or some kind of an object against the body of Karrie Dodd which resulted in her death.

The same evidence is sufficient to infer malice and purpose, both of which are essential elements of second degree murder. Ind. Stat. Ann. § 10-3404 (1956 Repl.) Since the evidence is sufficient to support the finding that the child died from a forceful blow inflicted by the appellant, this cruel act is also

sufficient to imply malice as a matter of law. In *Harris* v. *State* (1900), 155 Ind. 265, 272, 58 N. E. 75, this court stated, ". . . malice, as a legal inference, may be deduced from the perpetration of any deliberate and cruel act by one person against another." See also *Mobley* v. *State* (1949), 227 Ind. 335, 345, 85 N. E. 2d 489; *Wahl* v. *State, supra.*

Similarily the law has always stated than an individual intends the natural and probable consequences of his acts and such intent implies purpose by operation of law. It seems highly probable that when an adult inflicts a blow of the kind which the doctors testified that it would take to rupture the liver of a tiny three year old girl, the natural and probable consequence is death. *Newport* v. *State* (1894), 140 Ind. 299, 39 N. E. 926; *Mobley* v. *State, supra; Pitts* v. *State* (1939), 216 Ind. 168, 23 N. E. 2d 673. Therefore, there was sufficient evidence to warrant the jury in finding that all the essential elements of second degree murder were established to the satisfaction of the mind and conscience of each juror beyond a reasonable doubt.

The appellant also contends that the testimony of Karen Dodd was insufficient as she was a lying witness, citing *Penn* v. *State* (1957), 237 Ind. 374, 146 N. E. 2d 240 and *Estes* v. *State* (1964), 244 Ind. 691, 700, 195 N. E. 2d 471.

This court may pass upon the credibility of a witness only to the extent that it must be of the nature to induce a belief beyond a reasonable doubt of the appellant's guilt in the minds of jurors of average intelligence and reason. *Baker* v. *State, supra,* at p. 62. The facts at bar do not compare to any of the above cases. Where a witness has testified to facts out of court inconsistent with the testimony in court, the jury may disbelieve such witness's testimony or it may believe such portion of the testimony as is corroborated by other credible evidence. Therefore the contentions of the appellant with respect to the testimony of Karen Dodd should be rejected. Although the majority opinion seems to hold that it had the right to

weigh not only the evidence but seems to imply without so stating that the jury had no right under the law in this case to determine the credibility of either the defendant or Karen Dodd.

The appellant also contends that there is a lack of proof of the *corpus delicti* beyond a reasonable doubt, i.e., that the specific crime charged has actually been committed by someone. Likewise the discussion of the evidence above clearly refutes this contention.

Turning to the appellant's further contentions of error, he states that the lower court erred in overruling his motion for instructions to withdraw from the jury the issues of first and second degree murder, made at the close of the prosecution's opening statement. The appellant asserts the opening statement failed to state evidence by which the state was to prove the crime for which he was indicted. The appellant claims that this alleged failure was prejudicial to him for the reason that he was not fully apprised of charges against him.

Ind. Stat. Ann. § 9-1805 (1956 Repl.) states in part:

"First. The prosecuting attorney must state the case of the prosecution and briefly state the evidence by which he expects to support it and the defendant may then state his defense and briefly the evidence he expects to offer in support thereof."

The prosecutor read the indictment and then stated to the jury the evidence by which the state expected to prove the crime charged. The important parts follow:

". . . But after a while James David Hutchinson, the defendant, started beating on Karen Dodd, on Karen Dodd's three year old girl, Karrie. And this beating continued until on (sic) day Karrie died. Now Karrie died of a lacerated liver, and we will prove to you that the lacerated liver came by a blow, a very forceful, a tremendously forceful blow on Karrie Dodd, the three year old child, inflicted by the defendant, James Hutchinson; that he did this because he was in love with this woman, and he was jealous of the child,

who was the child of another man. And he killed this three year old child. Thank you."

The appellant's contentions would be tenable had there been some improper or inflammatory remark or misstatement of facts by the prosecutor. (However, even in such cases there must be a clear showing of an abuse of the trial court's discretion.) See *Ward* v. *State* (1965), 246 Ind. 374, 205 N. E. 2d 148; *Blume, Kissinger* v. *State* (1963), 244 Ind. 121, 189 N. E. 2d 568. Unless there is an abuse of discretion which is clearly prejudicial, the ruling of the trial court will not be disturbed. *Kallas* v. *State* (1949), 227 Ind. 103, 125, 83 N. E. 2d 769. It seems to me that the opening statement was not so inadequate as to show such an abuse of the trial court's discretion.

The appellant also complains of the trial court's failure to direct a verdict in his favor. Upon the foregoing review of the evidence and reasonable inferences to be drawn therefrom it, would appear that the latter asserted error is not well taken.

The appellant also asserts that under the evidence there is a fatal variance as to the crime charged in the indictment. The charge in substance was that Karen Dodd and the appellant killed Karrie Dodd by beating her and inflicting a mortal wound; whereas the evidence demonstrated that the appellant alone inflicted the mortal wound.

The law in this regard is well stated in *Madison* v. *State* (1955), 234 Ind. 517, 547, 130 N. E. 2d 35 (concurring opinion of J. Arterburn but which represented the majority opinion on this point) :

"In other words it seems to be well settled in this state and most jurisdictions that the accepted rule in determining the materiality of a variance in a criminal proceeding is that it must be of such substantial character as to mislead the accused in preparing and maintaining his defense or the variances of such a degree as is likely to place him in second jeopardy for the same offense."

See also *Roberts, Board* v. *State* (1964), 245 Ind. 185, 188-189, 197 N. E. 2d 304; *Smith* v. *State* (1960), 241 Ind. 1, 168 N. E. 2d 199; Ind. Stat. Ann. § 9-1127 (1956 Repl.) ; Note, *The Effect of Variance Between The Pleading and the Proof in Indiana Criminal Procedure,* 32 Ind. L. J. 258 (1957). In this instance the appellant states summarily in his brief that this variance was prejudicial with no explanation of how it prejudiced him. It is difficult to perceive any prejudice in this variance. The appellant was adequately informed of the charge that he was accused of killing the young girl and the date of such happening, etc. The mere fact that Karen Dodd was also joined in the charge would not have misled him as to any defenses possible. Additionally, it would seem that the appellant was not placed in a position that after jeopardy had attached, a second charge on the same crime or acts would have been successful. This is true because the same evidence would have been necessary to sustain a second charge wherein it might have been alleged that the appellant alone killed Karrie Dodd, thereby placing the appellant in double jeopardy. *State* v. *Elder* (1879), 65 Ind. 282, 285; *Cichos* v. *State* (1965), 246 Ind. 680, 208 N. E. 2d 685, pet. for reh. den. 210 N. E. 2d 363 (1965), cert. dismissed 87 S. Ct. 271 (1966). Therefore, I believe the appellant's contentions of error that this was a material variance should be rejected.

The appellant also asserts that since he was charged with a joint crime and the co-defendant was released by a *nolle prosequi,* then he is also innocent of such crime. However, the cases cited by the appellant are wholly inapplicable for the reason that in the separate trial of the appellant the evidence demonstrated that the death of Karrie Dodd resulted from a single act committed by the appellant. It was not a joint crime. Indeed this is the appellant's own contention in regard to the variance matters previously discussed. Consequently, without stating more, I believe that the appellant's contentions of error are inapplicable as the evidence demonstrates that there was no joint crime.

Finally, the appellant asserts that it was error for the trial court to submit the cause for argument, instruction, and deliberation to the jury at a late hour in the final day of trial. All errors in this regard have been waived by the appellant, for he failed to raise any objections to the court's actions; in other words there is nothing to indicate that appellant did not acquiesce in all the matters of alleged error. *Callahan* v. *State* (1964), 246 Ind. 65, 201 N. E. 2d 338, 341; *Brower* v. *State* (1956), 236 Ind. 35, 38, 138 N. E. 2d 237.

As a final commentary upon what I believe to be the most serious of the various errors in the majority's opinion, I quote therefrom as follows:

> "We are not unmindful of the serious crime here committed as shown by the evidence, and we have read the entire transcript of the testimony . . ."

It fails to indicate the exact nature of the acts which caused the ruptured liver or upon what basis the jury could have found or reasonably inferred from the evidence that a "serious crime was committed." Therefore in essence it appears abundantly clear that the majority has attempted to effect a compromise between an affirmance and a complete reversal without any legal basis.

For all the foregoing reasons it is my opinion that the lower court should be affirmed. If the majority opinion had completely reversed (resulting in an acquittal), I would not have dissented as emphatically as I do here.

NOTE.—Reported in 225 N. E. 2d 828.