**Anita VEGA, Appellant–Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

No. 12A04–9411–CR–465.

Court of Appeals of Indiana.

Oct. 17, 1995.

Rehearing Denied Dec. 1, 1995.

Transfer Denied Feb. 7, 1996.

Stephen W. Dillon, Indianapolis, for appellant.

Pamela Carter, Attorney General, Preston W. Black, Deputy Attorney General, Indianapolis, for appellee.

Pamela Carter, Attorney General, Preston W. Black, Deputy Attorney General, Indianapolis, for appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Defendant–Appellant Anita Vega appeals her conviction of involuntary manslaughter.[1]

We affirm.

### ISSUES

Vega raises six issues for our review, which we restate as:

1. Whether the trial court erred in denying Vega's motion for mistrial after the State's primary witness disclosed that the witness had taken a polygraph examination.

2. Whether comments made by the trial judge served to deny Vega's right to a fair trial.

3. Whether the trial court abused its discretion in refusing to allow testimony by a proposed expert witness.

4. Whether Vega was prejudiced by alleged prosecutorial misstatements made during closing argument.

5. Whether Vega was afforded effective assistance of trial counsel.

6. Whether the State presented sufficient evidence to support Vega's conviction.

### FACTS

At some point in 1969 or 1970, Vega instructed her nine year old daughter, Margarita, to stay home from school and check on three year old Anna Marie. Anna Marie had wet her bed on the previous evening, and as a punishment had been beaten, deprived of food, and placed in a cold room without clothing. Margarita checked on Anna Marie and found that she had wet a pair of shorts that she had managed to find. Margarita informed Vega of Anna Marie's condition; Vega responded by ordering Margarita to fill a tub with cold water. Vega then began kicking Anna Marie and beating her with her fists. When Anna Marie fell down, Vega picked her up by her hair and shook her. Vega continued beating Anna Marie for approximately five to ten minutes. By this time, Anna Marie's nose and mouth were bloodied.

Vega led Anna Marie into the bathroom and checked the water that Margarita had placed into the tub. Upon discovering that the water was warm, she smacked Margarita, and ordered her to place cold water in the tub. After Margarita did so, Vega beat Anna Marie again. During this beating, Anna Marie fell backwards into the tub. Vega pulled her out of the tub and beat her again. Before leaving the room, Vega ordered Margarita to place Anna Marie in the tub. Margarita persuaded Anna Marie to stand in the tub, but was unable to persuade her to sit down.

Vega reentered the bathroom and observed Anna Marie standing in the tub. Vega then struck Anna Marie's head with sufficient force to knock her out of the tub. Vega then picked up Anna Marie, and threw her head first into the tub. When Anna Marie gasped for air, Vega struck her again and held her head under the water. Vega then forced her weakening daughter to sit in the water. Vega then told Margarita to shower Anna Marie with cold water and "leave her there." Anna Marie was left alone in the bathroom with cold water running on her.

After watching soap operas for a number of hours, Vega asked Margarita to check on Anna Marie. Margarita entered the bathroom and observed Anna Marie floating face down in the water. Margarita placed Anna Marie on her stomach on the floor, pushed on her back, and observed water come out of her nose and throat. Margarita noted that Anna Marie was "ice cold." (R. 112).

Margarita informed Vega that she believed Anna Marie was dead. Vega responded, "She's not dead, stupid . . . Bring her out here." (R. 113). Margarita wrapped a towel

---

1. Vega was convicted under IND.CODE 35–13–4–2, which was the statute in force at the time of the events giving rise to the charge. The statute has since been repealed.

around Anna Marie and carried her out of the bathroom.

Anna Marie began making noises, and Vega instructed Margarita to place her on the unheated back porch. Margarita wrapped Anna Marie in a blanket and placed her on the porch. Margarita left the door open to enable heat from the house to reach the porch. When Vega discovered that the door was open, she smacked Margarita and ordered her to close it. Vega then "put her ... knuckle real hard under [Margarita's] chin" and said, "If you ever tell I'll kill you and you've seen me do it so you know I can." (R. 114).

Later that afternoon, Margarita's siblings returned from school. Vega informed one of the boys that Anna Marie was dead and that her funeral occurred while he was at school. When Vega forced Margarita to go out on the porch to get toys for one of the children, Margarita heard Anna Marie "making noises" that were "weird" and "more deep." (R. 117).

Later that evening, Vega's future husband, Luis, returned home from work. Margarita overheard Vega and Luis having a discussion in their bedroom. At one point, Margarita heard Luis say, "Well, didn't you know that could kill her?" (R. 119–120).

Margarita heard Luis exit the house. Luis then entered the house carrying a box. Margarita observed that the blanket that she used to cover Anna Marie was sticking out of the box. Margarita heard Vega tell Luis to "hurry up" because "if ... a policeman saw him walking down the street carrying a box we'd all be in trouble." (R. 121–122).

When Luis returned home, Margarita heard Vega ask him what took so long. Luis responded that "it wasn't easy to bury a body in frozen ground." (R. 123–124).

Margarita testified that she talked about Anna Marie with Vega in 1985. At that time, Vega telephoned Margarita and said that she had a surprise for her. When Margarita went to Vega's residence, Vega pointed towards a brown sack and said, "there's your surprise." (R. 139). Upon opening the sack, Margarita observed what appeared to be a

bone on top of dirt. Margarita screamed and left Vega's house.

A couple of months later, Margarita returned to Vega's house and asked her what had happened to the sack. Vega indicated that she and another person had buried the sack in a local cemetery. Vega then accompanied Margarita to a local cemetery and pointed out where she allegedly buried the sack.

In September, 1992, Margarita informed police officers of the death of Anna Marie. The police officers found a birth certificate documenting Anna Marie's birth in 1967. The officers were unable to find any other records pertaining to Anna Marie, such as a death certificate or school records.

In June, 1993, Vega gave a statement to the officers. At first, she denied having a daughter with the name "Anna Marie." When confronted with the birth certificate, she acknowledged Anna Marie's existence. She then stated that she found Anna Marie unconscious, laid her on a bed, and waited three to four hours for Luis to return home. Luis then buried Anna Marie "in a field along the railroad close to where he worked." (R. 274–275).

Vega was charged by indictment with involuntary manslaughter. Following a jury trial, she was convicted of the charged offense. She now appeals.

## DISCUSSION AND DECISION
### I. POLYGRAPH EXAMINATION

■ Vega contends that the trial court erred in denying her request for a mistrial after Margarita disclosed that she had taken a polygraph examination. On direct examination, Margarita was questioned as to how she had helped police officers with the investigation. She testified that she accompanied police officers to the cemetery and showed them where the sack was allegedly buried. She further testified that she "wore a wire" while talking about Anna Marie with her sister, Guadalupe. When questioned as to how she further helped police, Margarita responded, "I took a polygraph." In response to Vega's objection, the trial court immediately admonished the jury to disregard the

statement. After hearing arguments by counsel, the trial court again admonished the jury to disregard Margarita's comment.

In her case in chief, Vega called Officer Mark James, the administrator of the polygraph examination, as a witness. Vega introduced Officer James's report, which states that when questioned, "[Were] you telling the truth when you said your Mother killed your sister?", Margarita responded, "no." The report further contained Officer James's conclusion that Margarita "[had] not been completely truthful." On cross-examination, however, Officer James testified that the polygraph examination was inconclusive as to whether Margarita had told the truth. The polygraph report allowed Vega's attorney to state during closing argument that:

> [The prosecutor] asked [Margarita], not trying to elicit the information, "Did you do anything else to cooperate with the investigation?" She thought and she thought and she thought and she said, "Yeah, I took a polygraph" ... Don't you see what happened here? [The prosecutor] got trapped in the middle of prosecuting a case that he didn't even know his star witness had failed the polygraph test. He's completely painted into a corner and based on that evidence you're supposed to convict beyond a reasonable doubt when you know she failed the polygraph test.

(R. 420–421).

■■■ The results of a polygraph examination, or the offer or refusal to take an examination, are not admissible in a criminal prosecution absent a waiver or stipulation by the parties. *Houchen v. State* (1994), Ind. App., 632 N.E.2d 791, 793. A mistrial should be granted where the accused, under all the circumstances, has been placed in a position of grave peril to which she should not have been subjected. *Conn v. State* (1989), Ind., 535 N.E.2d 1176, 1180. The prejudice to the rights of the accused from such proof may be sufficiently mitigated by an admonition to the jury. *Id.*

The potential prejudice in the instant case was that the jury would conclude from Margarita's testimony that she passed a polygraph examination. Thus, the testimony of the primary witness against Vega would be impermissibly bolstered. However, the jury had the benefit of Officer James's report indicating that Margarita was not completely truthful. The jury also had Officer James's dubious testimony that his report indicated that the results of the examination were inconclusive. Either way, the jury could not have impermissibly concluded that Margarita passed the polygraph examination. Accordingly, no prejudice occurred and Vega was not placed in a position of grave peril to which she should not have been subjected.

## II. TRIAL COURT COMMENTS

■■ Vega contends that the trial judge denied her right to a fair trial by his comment during closing arguments. She argues that the trial judge's comment indicated that he believed she was guilty.

The record indicates that during closing argument, Vega's counsel suggested that the prosecution was surprised at trial upon learning that Margarita allegedly failed the polygraph examination. In his rebuttal argument, the prosecutor pointed out that he knew the polygraph results. The following discussion ensued:

> MR. TROEMEL: [Vega's counsel]: Objection, this isn't in the evidence. Objection.
>
> [PROSECUTOR]: It's not in evidence, but you ...
>
> MR. TROEMEL: I'm sorry, that's not in evidence and he can't argue facts outside the record.
>
> [PROSECUTOR]: I can when he misled the jury and he knows I talked to Mark James.
>
> MR. TROEMEL: That is not an exception.
>
> [PROSECUTOR]: Yes, it is.
>
> MR. TROEMEL: Not an exception.
>
> [PROSECUTOR]: He misled ...
>
> MR. TROEMEL: If he wants to call himself as a witness, we can have a mistrial and try it again.
>
> THE COURT: You can take it up on appeal.
>
> [PROSECUTOR]: I talked to Mark James months ago.

MR. TROEMEL: Same objection.

THE COURT: Objection is noted.

(R. 448–449).

A trial judge should refrain from making unnecessary comments and should remain impartial. *Marbley v. State* (1984), Ind., 461 N.E.2d 1102, 1107. Additionally, the trial judge has a responsibility to preside over the trial and control the proceedings by taking responsible steps to insure proper order and discipline. *Taylor v. State* (1992), Ind.App., 602 N.E.2d 1056, 1059, *trans. denied.* Implicit in the judge's duty to control the proceedings is the power to give reasonable admonitions to witnesses and counsel. *Id.*

In the present case, the trial judge's remark was apparently the judge's way of overruling the objection of Vega's counsel and stopping the bickering of the attorneys. While the remark was not the most direct exercise of the judge's discretion, we cannot say that it lead the jury to believe that the judge had predetermined Vega's guilt. This is especially true in light of the judge's later instruction informing the jury not to make any inferences of guilt based upon his comments.[2] When the jury is properly instructed, it is presumed to have followed the instruction. *See Duncanson v. State* (1987), Ind., 509 N.E.2d 182, 186.

## III. EXPERT WITNESS

Vega contends that the trial court erred in refusing to allow Dr. Ian Neath to testify as an expert. Dr. Neath is a professor of psychology specializing in the study of human memory. He would have testified on the various factors affecting a person's memory.

Expert testimony is generally admissible under Ind.Rule of Evidence 702 if the witness is qualified, the testimony rests upon reliable scientific principles, and the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue...." Admission of such evidence is in the discretion of the trial court,

and we will not disturb the trial court's ruling absent a showing of abuse of discretion. *Wissman v. State* (1989), Ind., 540 N.E.2d 1209, 1212.

In the present case, the trial court asked Dr. Neath if he could predict whether the memory of a witness was accurate. Dr. Neath responded that:

Cognitive psychologists and memory researchers have not been able to identify any variables that will let you predict whether or not that's an accurate memory. In other words, if I may clarify, that memory could be very accurate, it could be very inaccurate, there could be various shades in between. I'm not saying that all memories are inaccurate or all memories are accurate. What I'm saying is just based on the memory that the person reports you cannot say which kind of memory is accurate, inaccurate mildly or so on ... I know very little about this particular case ... There is a great deal of variation that can take place and we're unable to identify any factors that would let us predict whether that's accurate or not....

(R. 358–359). Based upon Dr. Neath's statements, the court determined that Dr. Neath's testimony would not be of assistance to the jury in understanding the evidence or in making its final determination. Specifically, the trial court stated:

THE COURT: O.K., the question is proposed testimony such that will assist the trier of fact in understanding the issues or determining the facts in issue. I think that the doctor does have special knowledge and education greater than the average person. It boils down to will the testimony assist the jury in understanding the issues or the issue. The issue as you pose it, Mr. Troemel, is ...

MR. TROEMEL: The memory of the witness [Margarita].

THE COURT: The accuracy of the memory or [whether] the testimony [will] assist the jury in determining the facts at issue. I suppose we could say that

---

2. The instruction stated that, "Nothing that I say during trial is intended as any suggestion of what facts or what verdict you should find. Each of you, as jurors, must determine the facts and the verdict." (R. 469).

that's true too, because the evaluation of the memory would help in determining whether or not the testimony is true or accurate. I think dispositive of this issue is the statement by the doctor that there is no way of predicting whether or not memory is accurate. There's—I don't think that the testimony can tell the jury whether ... the testimony of [Margarita] is more likely to be believed or less likely to be believed. It's not going to aid them in any way. It's just going to tell them it's up to them to decide and they already have that decision to make. I think that if the doctor's testimony would assist them in any way in this question I would declare him an expert whose testimony would assist the jury but all ... the doctor's testimony is going to do is to tell them that they have a question and they already know that they have a question. . . .

(R. 372–374).

On appeal, Vega argues that Dr. Neath would have assisted the jury by debunking commonly held beliefs about memory. She further argues that Dr. Neath would have shown that "memories from stressful or shocking situations are not more accurate or remembered longer than other memories, but, in fact, are prone to be significantly less accurate." Reply brief at 15. At trial, however, the offer of proof mixed theories of memory with assertions of the witness's inability to make an accurate assessment of Margarita's testimony. There was no attempt to show how any of the theories could be used to assist the jury. Under these conditions, we cannot say that the trial court abused its discretion in refusing to allow Dr. Neath to testify. This is especially true in light of the fact that Vega extensively cross-examined Margarita on the accuracy of her memory.

## IV. PROSECUTORIAL MISSTATEMENTS

Vega contends that she was denied due process and a fair trial by misconduct of the prosecutor during final argument. She argues that the prosecutor misstated the law on the elements of involuntary manslaughter.

During final argument, the prosecutor pointed out that the State did not have to prove the exact medical cause of Anna Marie's death. The prosecutor stated:

We don't have, I wish we did, we don't have an autopsy to give you to tell you whether she drowned or not. We don't know that. We don't have an autopsy to give you to tell you whether she died by hypothermia or by freezing. We don't have an autopsy to tell you that she was so weakened by the beatings and the starvations that she just gave out. We don't know these things. But in listing the elements of the crime of involuntary manslaughter, the causation of death is not included. You get to use your common sense, your knowledge of people to say that that child had to die from that treatment. Regardless of whether you've got a doctor or pathologist or coroner to tell you that.

(R. 383–384).

At the time the offense was committed, I.C. 35–13–4–2 (1975) stated that a person committed involuntary manslaughter when the person "kill[ed] any human being without malice, express or implied, involuntarily but in the commission of some unlawful act. . . ." Homicide is an element of involuntary manslaughter, and in order to prove homicide, the State must show that the defendant caused an injury to the decedent contributing mediately or immediately to the decedent's death. *Gibbs v. State* (1981), Ind. App., 426 N.E.2d 1150, 1154. As we explained in *Elliott v. State* (1983), Ind.App., 450 N.E.2d 1058, 1063:

To constitute the crime of manslaughter, there must be a legal relation between the commission of the unlawful act and the homicide, that it logically follows that the homicide occurred as a concomitant part of the perpetration of, or in furtherance of an attempt to commit, the unlawful act. Therefore, it follows that death must be the natural result and the probable consequence of the commission of the unlawful act upon which the homicide is based.

In the present case, the unlawful act alleged in the indictment was cruelty and

neglect of Anna Marie. Therefore, it was incumbent upon the State to prove that Vega's cruelty and neglect caused Anna Marie's death.

The prosecutor properly informed the jury regarding the State's burden. The prosecutor stated:

> [The elements of involuntary manslaughter] are fourfold. One, that Anita Marie Vega killed another human being, specifically, Anna Marie Arguello. Two, that that killing was involuntary, but in the commission of another unlawful act. Specifically, cruelty and neglect of children. *Involuntary means that we do not have to prove to you that she set out with deliberate plan to kill her daughter, but only that it happened as a result of other deliberate acts.* We're not here with an intentional murder indictment ... *We're not obligated to prove intentional murder, only that the death resulted from other acts.*

(R. 380–381). (Emphasis added). These elements tracked the trial court's instruction to the jury.

The prosecutor's comments, when read as a whole, properly informed the jury that the State's burden was to prove that Vega's acts of cruelty and neglect were the proximate cause of Anna Marie's death. In advising the jury that "the causation of death is not included," the prosecutor was referring to actual cause, rather than proximate cause. The State was not required to prove the actual cause of Anna Marie's death, i.e. drowning, starvation, or beating. Rather, the State was required to prove that Vega's *conduct* "contributed mediately or immediately to the death of another person." *Warner v. State* (1991), Ind.App., 577 N.E.2d 267, 270.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

■ Vega contends that her trial counsel was ineffective in not objecting to the prosecutor's alleged misstatement of the law. To prevail on a claim that counsel was ineffective for failing to make a proper objection, it must be shown that a proper objection would have been sustained by the trial court. *Clark v. State* (1990), Ind., 561 N.E.2d 759,

763. As we stated in Issue IV, the prosecutor did not misstate the law regarding the elements of involuntary manslaughter. Accordingly, the trial court would not have sustained an objection by trial counsel. Trial counsel was not ineffective.

## VI. SUFFICIENCY OF THE EVIDENCE

■ Vega contends that the State failed to present sufficient evidence to support her conviction. Specifically, she argues that the State failed to establish that her actions were the proximate cause of Anna Marie's death.

■ In reviewing sufficiency claims, this court does not reweigh the evidence or judge the credibility of the witnesses. We will consider only the evidence most favorable to the verdict, together with all reasonable and logical inferences to be drawn therefrom. The verdict will be affirmed if there is substantial evidence of probative value to support the conclusion of the trier of fact. *Clark v. State* (1990), Ind., 562 N.E.2d 11, 16, *cert. denied* 502 U.S. 961, 112 S.Ct. 425, 116 L.Ed.2d 445 (1991). Reversal is appropriate only when reasonable persons would be unable to form inferences as to each material element of the offense. *Groves v. State* (1985), Ind.App., 479 N.E.2d 626, 629.

Margarita testified that Vega beat Anna Marie until she bled, immersed her in cold water for a long period of time, and refused to feed her or keep her warm. Furthermore, Vega herself admitted that she did not seek medical assistance when she observed Anna Marie's injuries. Under these circumstances, the jury was entitled to infer that Anna Marie died as a result of Vega's neglect and cruelty. *See Hall v. State* (1980), 273 Ind. 507, 405 N.E.2d 530, 535 (affirming a conviction of involuntary manslaughter when evidence indicated that "the victim was subjected to a continuing pattern of abuse from the defendant"); *Hutchinson v. State* (1967), 248 Ind. 226, 225 N.E.2d 828, 834 (holding that the jury could infer from the evidence that excessive means of punishment brought about the victim's death). Although the exact medical cause of death was unknown, the

proximate cause of death was easily ascertainable. The various acts of cruelty and neglect perpetrated upon Anna Marie by her mother proximately caused Anna Marie's death.

## CONCLUSION

Vega has failed to establish that the trial court committed reversible error. Vega has further failed to establish that the evidence was insufficient to support her conviction.

Affirmed.

CHEZEM and STATON, JJ., concur.